[No. S004708. Crim. Nos. 25377, 25540. Aug. 19, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNY MICKLE, Defendant and Appellant.

144

**COUNSEL**

Fern M. Laethem, State Public Defender, under appointment by the Supreme Court, Roy M. Dahlberg, Musawwir M. Spiegel, Thomas L. Carroll and John Fresquez, Deputy State Public Defenders, for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald S. Matthias, Morris Beatus, Aileen Bunney and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAXTER, J.**—Defendant Denny Mickle was convicted of one count of first degree murder (Pen. Code, § 187)[1] with personal use of a knife (§ 12022, subd. (b)), and arson (§ 451, subd. (b)). Under the 1978 death penalty law, the jury found true a special circumstance that the murder occurred while defendant was engaged in the commission of a lewd and lascivious act upon a minor. (§ 190.2, subd. (a)(17)(v); see § 288, subd. (a).)

In a separate proceeding held after the guilt verdict was rendered but before the penalty phase began, the jury found defendant competent to stand

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

trial. (§§ 1367, 1368.) Defendant purported to appeal from the competence determination. While that appeal was pending in the Court of Appeal, a penalty trial was held. The jury sentenced defendant to death, and the trial court denied the automatic motion to modify the verdict. (§ 190.4, subd. (e).) The death judgment was automatically appealed to this court. (§ 1239, subd. (b).) The interlocutory appeal from the competence determination was transferred here (Crim. 25540) and consolidated with the automatic appeal (S004708/Crim. 25377).

For reasons which will be explained, the interlocutory appeal from the competence determination will be dismissed and defendant's challenges to that determination considered in the automatic appeal from the final judgment. We find no prejudicial error affecting the guilt, competence, or penalty verdicts. The judgment will be affirmed in its entirety.

## I. GUILT PHASE EVIDENCE

### A. *Prosecution Case*

1. *Crime scene evidence.* On February 15, 1983, the victim, 12-year-old Lashan, and her parents, Darrell and Sally K., moved from Pacifica to Daly City. Their new home was the Mission Bell Motel, which was occupied primarily by permanent residents, including families. Darrell happened to see defendant on the street during the move and asked for his help. Defendant was a longtime acquaintance of Darrell's but apparently had not met Sally or Lashan before. Because defendant had no home and all three adults were unemployed, the K. family agreed to let defendant stay with them and share expenses.

The foursome occupied unit 10. It had a front room with a door facing onto the motel courtyard, a hallway, a bathroom, a kitchen, and a bedroom with a door opening into an alley behind the unit. There was no telephone in the unit, so calls had to be handled through the motel office or at a public booth nearby. Defendant slept on a murphy bed in the front room, and Lashan and her parents slept in the bedroom. The first nine days of joint residence were uneventful.

On February 24, the day of the crimes, Lashan's parents left the motel at noon and drove to Oakland to visit Darrell's sick grandmother. At some point, Sally arranged by phone to have a woman who worked at Lashan's school drive Lashan home in the afternoon. About 3:45 p.m., Sally called the motel and told defendant about the arrangement. He promised to take care of Lashan until Darrell and Sally returned.

Defendant was in the unit at 4 p.m. when the school employee dropped Lashan off and departed. Lashan was wearing pants and a plaid shirt. At 5:30 p.m., Sally phoned to say that she and Darrell would not be home for awhile. Defendant reported that Lashan had arrived home safely and was doing homework and watching television. This was the first time defendant and Lashan had ever been alone together.

At 7:30 p.m., two rental store employees arrived at unit 10 to repossess the television set. Defendant answered the door and briefly chatted with them. One of the employees went into the bedroom and saw Lashan lying on the bed watching television. He exchanged a few words with her and took the set. The employee could not remember at trial what Lashan was wearing or whether she was lying underneath the covers. He was certain, however, that both defendant and Lashan were acting "normal."

Between 7:30 and 8:30 p.m., a motel resident saw defendant pace "back and forth" between unit 10 and the phone booth near the office. The resident had been working on his car in the courtyard across from the unit since 1 p.m., and had seen defendant make the same trip a few times earlier in the day. Immediately before the resident left the motel premises at 8:30 p.m., he saw defendant enter unit 10.

Defendant was not seen again until 9:50 p.m., when he arrived at the South San Francisco home of his girlfriend, Ruthie. He told her he had walked from the motel, a one-hour trip by foot. He was carrying a clock radio, which belonged to the K. family and had been sitting on the television in their bedroom.

At 10:30 p.m., while Ruthie was in the room, defendant called the motel and asked to speak to the residents of unit 10. He hung up moments later and told Ruthie no one was home. Defendant then carried the phone into another room and called Lashan's parents at a relative's house. Defendant told Darrell that he had left the motel at 7:30 p.m., and was calling from the Tenderloin. Defendant also said he needed a key to the unit. When Darrell noted that Lashan could open the door, defendant apologized for being "stupid." Darrell and Sally were disturbed by the call and immediately drove home. Meanwhile, defendant borrowed bus fare from Ruthie and said he was going to the Tenderloin. He left her house for a few hours.

At 10:50 p.m., shortly before Lashan's parents arrived back at the motel, an employee of a nearby restaurant saw flames shooting out of unit 10's bedroom window. The fire was soon extinguished. Lashan's naked, dead

body was found lying facedown on the bathroom floor.[2] Her back was covered with soot and she had been stabbed several times. There was blood but no soot on the floor underneath the body. Bloodstains were found near the bottom of a hallway dresser and the bathroom doorjamb. A motel butcher knife with a bloodstained blade was found on the counter near the kitchen sink.[3]

The front room, hallway, bathroom, and kitchen had been heavily damaged by soot, smoke, and heat. Charred paper was found on a burned section of the murphy bed in the front room. In the bedroom, the mattress and base of the headboard had been consumed by flames, but the top of the headboard and nearby furniture suffered only minor blistering and discoloration. In the alley outside, broken glass from the bedroom windows had soot on one side. The doors and windows were locked and showed no signs of forced entry.

Defendant returned to Ruthie's house about 2 a.m. and spent the night. At 7 a.m., Ruthie awoke and saw a television report which apparently identified defendant as a suspect in the motel crimes. She immediately told him to leave the house and call the police. He disclaimed any knowledge of the events described in the report and then left. Ruthie called the police.

Defendant called the police an hour later, at 8 a.m., and said he had heard about the fire on television and wished to discuss it. However, he did not show up at the prearranged meeting place. Defendant made a similar call at 9:30 p.m., identified himself as a "suspect," and was soon taken into custody.

2. *Defendant's in-custody statements.* A half-hour after being taken into custody on February 25, defendant had three consecutive interviews at the police station. He first spoke with Detectives Reese and McCarthy pursuant to a *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]), and denied committing the crimes. He said he left Lashan asleep at the motel at 8:15 p.m. on February 24, and rode a bus to the Tenderloin. He claimed to have called Lashan's parents from there and then visited Ruthie.

Defendant next spoke with his parole officer, Mr. Bandettini, pursuant to another *Miranda* waiver. (Bandettini was identified as a "state investigator"

---

[2] Sally testified that Lashan was a quiet, intelligent girl who was extremely "shy" about her body. She never walked or relaxed naked in the house, and often fell asleep in her clothes or lied about having taken a bath in order to avoid getting undressed at night. According to Sally, Lashan "would stay in her clothes forever unless [her parents] made her get out of them."

[3] No fingerprints were found on the knife.

at trial.) Defendant first denied the crimes, but then said he could not "remember" whether he had stabbed Lashan. When asked if he had sex with her, he replied, "I may have."

Detectives Reese and McCarthy immediately resumed questioning. Defendant began by saying he "could have killed" Lashan and "didn't know what [he] was doing." He admitted having "sex" with her, but was unclear about when it occurred.[4] Although defendant first denied any involvement in the fire, he later answered in the affirmative when asked if he could have killed Lashan and set the fire. Defendant repeatedly said that he did not know how many times Lashan had been "stuck," and that his actions were not "intentional."

When asked to describe the evening's activities in greater detail, defendant replied, in somewhat disjointed and emotional terms, that he and Lashan had prepared a meal, played cards, and arm wrestled. He started looking at her and feeling "crazy." He paced back and forth between the motel office and the unit. At some point, he lifted the knife from among the dirty dishes in the kitchen sink, held it in both hands near his head, and attacked her with it. When asked how Lashan got into the bathroom, defendant said he "might have stuck her one time while she was asleep," and "she might have jumped up and tried to get away from it."

Defendant was arrested at 2 a.m. on February 26, four hours after questioning had begun. He was carrying a small Bible and a keychain that Sally owned and kept in the bedroom nightstand. A lighter and matches were also found in his possession.

At 10 a.m. on February 27, Detectives Reese and McCarthy briefly spoke with defendant at the Chope hospital jail ward. Defendant said he had started a fire on the murphy bed, stamped it out, and then started the bedroom fire, using paper each time. When asked whether Lashan had made him angry that night, he said, "no." As before, defendant said he could not remember the number of stab wounds, but knew that Lashan had "jumped up" after the first one. When asked what he did with the knife after the stabbing, defendant replied: "I was holding it [in] both hands, my hands were shaking[.] I saw the blood dripping down the knife, I put the knife in a basket." When

---

[4]When the officers first asked defendant whether he had sex with Lashan, he said, "Yeah, I did. I am not sure if I touched her this time." In midinterview, they asked whether he had sex with Lashan before the stabbing. He said, "Afterwards[.] I had sex with her, afterwards." Towards the end of the interview, defendant made two other statements on the topic, namely, "I can't remember if I touched her" and "I might have [had sex with her]."

asked if Lashan was still breathing at the time, defendant said: "Yes[,] she was breathing and calling my name. She had a dress on."

Defendant told a Chope hospital nurse that he had killed the 12-year-old daughter of a woman he was living with in a Daly City motel and had set the room on fire.

After his arrest but before the guilt trial, defendant shared a county jail cell with Jeffrey Steele, who was awaiting sentencing after pleading guilty to burglary. Steele testified that defendant said he had "tak[en] some young pussy" and "killed" the girl because she threatened to tell her parents that he had "raped" her. Defendant identified the victim as the 12-year-old daughter of friends with whom he had been living in a Daly City motel. According to Steele, defendant admitted choking and stabbing the girl, but believed he would "beat" the charges because no weapon was found and because he had started a fire to conceal the murder. When Steele mentioned that defendant could have had sex with a prostitute for only a few dollars, defendant said, "but it is not like that young pussy."

3. *Expert testimony.* City Fire Inspector Christensen examined unit 10 and concluded that the fire had been "intentionally" set. It had two separate points of origin (the two beds), paper had been used as an accelerant on the murphy bed, and no electrical or other "accidental" cause was found. The bedroom fire started quickly at the foot of the bed, where the metal springs had collapsed from intense heat, and then died down and burned slowly for one or two hours. Christensen explained that the bedroom would have been completely destroyed had the fire burned fast and hot. The large amount of soot—a sign of "incomplete combustion"—was also indicative of a low-oxygen, slow-burning fire. The buildup of carbon monoxide and other gasses had undoubtedly blown out the windows, admitting oxygen and causing the fire to flare up shortly before discovery.[5]

State Fire Investigator McGill reviewed official records and conducted tests upon motel bedding material. Like Christensen, McGill concluded that the fire had been intentionally set and smoldered for "a minimum of two hours."

An autopsy performed by pathologist Dr. Lack revealed that Lashan had died of four deep penetrating stab wounds, namely, a chest wound passing

---

[5]Christensen testified that a fire that *starts* quickly can *burn* slowly depending upon various factors, including the amount of fuel provided by any accelerant and the amount of oxygen. Christensen believed that even though the bedroom fire burned slowly, it started quickly by means of some accelerant. He initially hypothesized that stains found on the bedroom carpet might have been made with a liquid accelerant. Subsequent laboratory tests performed at his direction ruled out this possibility.

through the right lung, an abdominal wound exiting through the back, and two wounds entering from the back. All wounds were made while she was lying down, and were "consistent" with the motel butcher knife. No defensive knife wounds were found. Several other injuries suggested Lashan had been "immobilized" shortly before the stabbing: (1) a bruise to her left eye had probably been inflicted with a punch, (2) a "deep imprint" across the front of her neck had probably been made while her necklace was being pulled tightly from the back, and (3) fingernail marks on her throat had probably been made while she was being choked.

The autopsy further disclosed that after the stabbing, Lashan walked at least briefly while the fire burned and survived for an additional 30 minutes, probably in a state of "incipient shock."[6] Dr. Lack placed the time of death at 9 p.m., with a half-hour "grace period" on either side. No signs of recent trauma to the genital area were found. However, because Lashan had a "mature" vagina in which the hymen had been ruptured several months earlier, the absence of trauma was inconclusive as to whether intercourse had occurred shortly before death. A vaginal swab revealed the presence of semen.

Dr. Blake, the forensic expert who tested the swab, found a small amount of semen containing essentially equivalent amounts of type A secretor and type B secretor blood group substances.[7] The amount of semen suggested that intercourse had occurred 3 to 36 hours before Lashan's death, probably 18 to 24 hours beforehand. The semen could have been donated by a single individual with type AB secretor blood. Alternatively, there could have been two different donors, one of whom was a type A secretor and the other who, like defendant, was a type B secretor. In order for two donors to have produced this equivalent "A/B" ratio, both must have ejaculated near the same time, or one ejaculated and the other subsequently deposited only preejaculatory fluid.[8]

---

[6]Dr. Lack testified that the soles of Lashan's feet were coated with a mixture of blood, soot, and paint flecks, indicating that she walked and bled during the fire. Soot covered a layer of coagulated blood on top of her wounds but had not entered them, indicating that she bled during the fire. Soot also was found "deep down" in Lashan's lungs, and she had a 45 percent carbon monoxide blood level. These two facts indicated that she was alive and breathing for a "fairly lengthy period" during the fire. The stab wounds, not the carbon monoxide, were the "immediate cause of death."

[7]Lashan was a type O secretor. Defendant is a type B secretor.

[8]Dr. Blake said nonejaculation is not unusual in sexual assault cases, i.e., it occurs 25 to 30 percent of the time. Criminalist Ng testified that she tested the vaginal swab and also found semen. However, she used techniques admittedly less "sensitive" than those employed by Dr. Blake and found no trace of type A or B blood group substances.

## B. *Defense Case*

The defense theory was that the fire began after defendant arrived at Ruthie's house and burned quickly. One Detective Hawthorne testified that Fire Inspector Christensen had hypothesized during his initial examination of the crime scene that the front room fire burned for 20 to 25 minutes and that the bedroom fire "started rapidly" by means of a liquid accelerant.

## II. COMPETENCE PHASE EVIDENCE

After the guilt verdict was rendered, defendant moved for a competence hearing (§§ 1367, 1368.) The motion was granted under circumstances which will be discussed later. Criminal proceedings were suspended, competence phase counsel was appointed, and a new jury was empaneled.

At the ensuing hearing, two court-appointed psychiatrists testified that they had recently examined defendant and found him competent. Dr. Small explained that defendant was "cooperative" and "logical," and showed no sign of serious mental disorder; even if defendant was being truthful in claiming to have experienced a midtrial "hallucination" of Lashan, such an experience is neither disabling per se nor unusual for persons suffering from personality problems, stress, and/or a guilty conscience. Dr. Bryan testified that defendant suffered from a "passive-aggressive" personality problem and sexual deviation, but that he spoke about the criminal trial in an "appropriate" and "rational" manner. Defendant knew that any "hallucination" he had experienced was not real. Finally, a deputy sheriff testified that defendant's personal habits and deportment in jail over the preceding year were excellent, and that he never acted in a disruptive or bizarre fashion.

The jury found defendant competent to undergo a penalty trial.

## III. PENALTY PHASE EVIDENCE

As requested by defendant, a new jury was empaneled at the penalty phase.

## A. *Prosecution Case*

The prosecution called most of the witnesses who had testified against defendant at the guilt phase to establish the circumstances of the crime. Notable exceptions included forensic expert Dr. Blake (who testified *for*

defendant at the penalty phase) and informant Steele (who gave no penalty phase testimony). (§ 190.3, factor (a).)[9]

The prosecution also introduced certified copies of defendant's two prior felony convictions: a 1975 jury conviction of lewd conduct against Rosa S. (§ 288, subd. (a)), and a 1980 conviction upon a guilty plea of wilful cruelty to a child, Sheba R. (§ 273a, subd. (1)). The victims and other witnesses testified about these crimes, both of which involved forcible sodomy and/or rape. (§ 190.3, factors (b), (c).) In addition, Sheba's sister, Lakecia H., testified about defendant's unadjudicated forcible rape of her at age 13 in 1979. (*Id.*, factor (b).)

1. *The 1975 rape and sodomy of Rosa.* 18-year-old Rosa testified that in May 1975, when she was 7 years old, defendant came to the house to visit her mother, Carol, who had known defendant's family for several years. Carol was not there. Defendant ordered Rosa, who was at home with her siblings, to go into the bedroom. She complied out of fear. Defendant disrobed, opened Rosa's bathrobe, and pulled down her panties. He then raped and sodomized her. She struggled and told him to stop because he was hurting her. He ignored her pleas and held her down with the weight of his body. Ashamed, she did not tell her mother. Several days later, Rosa began experiencing a painful vaginal discharge and was examined by her mother. Rosa was taken to a doctor and treated for gonorrhea. Both Carol and the doctor described Rosa's symptoms and diagnosis at trial. Carol also testified that she contracted gonorrhea during a single sexual encounter with defendant near the time Rosa's infection was discovered.

2. *The 1979 rape of Sheba.* 13-year-old Sheba testified that in fall 1979, when she was 7 years old, defendant was intimately involved with her mother, Vesta, and was living with the family. One night, Sheba was sleeping in a bed with one of her sisters and with Vesta. Sheba woke up and found that defendant had pushed aside her bedclothes and was having sexual intercourse with her. She became afraid and tried to pull away. Defendant squeezed her stomach until it hurt and held her down with his arms. Sheba told Vesta about the assault the next day. Two weeks later, Sheba began experiencing a painful vaginal discharge but was too ashamed to tell her mother. Sheba's father, Herbert, testified that he noticed the discharge on Sheba's panties while she was undressing at his house. He took her to the hospital where she was treated for gonorrhea. The doctor confirmed this diagnosis at trial. Herbert also testified that when Sheba told him about the rape, he immediately went to confront defendant at Vesta's house. Defendant

---

[9]The Attorney General erroneously maintains that defendant's postarrest statements to Detectives Reese and McCarthy at Chope hospital were not introduced at the penalty phase. Such evidence appears in an augmentation to the record filed in this court on April 12, 1989.

fled. When defendant returned, he punched Herbert and the two struggled until the police came. Vesta did not testify.

3. *The 1979 rape of Lakecia.* 19-year-old Lakecia testified that she is Sheba's older sister and Vesta's daughter. Defendant befriended Lakecia on the street, and met the rest of the family through her. In fall 1979, when Lakecia was 13 years old, defendant forced his way into the locked bathroom just as Lakecia was finishing her bath. He pushed her onto the floor and had sexual intercourse with her. She told him to stop but was afraid he would hurt her if she resisted. She soon noticed an unusual vaginal discharge and visited the doctor. She learned she had gonorrhea and was pregnant with defendant's child. Lakecia gave birth to a daughter, Makeda, whom defendant acknowledged as his own.

## B. *Defense Case*

1. *The crimes.* Defendant called Detective Hawthorne and the prosecution's forensic expert, Dr. Blake. Each witness repeated his guilt phase testimony about the fire and the semen found in Lashan's vagina.

2. *Defendant's testimony.* Defendant, who was 27 years old at the time of the crimes, testified on direct examination as follows: [10] he grew up in a two-parent home with two brothers and a sister. He had little interest in school and sometimes fought with his classmates, but was not "violent." He had "hallucinations" as a boy, e.g., a ghost and a headless person. Similarly, at Chope hospital, he thought a creature was trying to enter his room and hurt him.

Defendant admitted that about age 14, he climbed into bed with his 11-year-old sister while she was asleep and tried to have sex with her. She resisted and told their mother. Defendant explained that he had not previously thought about or been "exposed" to sex and was simply "curious." About the same age, he tried to choke a neighbor lady but "didn't realize" what he was doing.

Defendant testified that a short time later, his parents sent him to the psychiatric ward of St. Mary's Hospital for evaluation. Later, when defendant apparently was almost 16, he was admitted to Napa State Hospital (Napa). He was given depressive medication in doses which he believed were unnecessarily large and disabling. He also claimed to have been housed in the adult unit for several months even though certain staff members said he was too young to be there. Defendant testified that the hospital initially

---

[10] Pertinent facts elicited on cross-examination will be discussed later in the opinion.

did nothing when he reported being raped by an adult patient. A few weeks later, defendant was moved to the adolescent unit.

Defendant testified that he felt "relaxed" and "fit right in" with patients his own age. He attended classes and social events (e.g., dances, bowling), but had difficulty talking in group or individual therapy sessions. Defendant indicated that he might have benefited more from therapy if he had been encouraged to participate. He said there were "a lot of sexual activities" among the patients at Napa, but he did not implicate himself in such misconduct.

Defendant testified that he was released from Napa during his 16th year, but did not feel ready to leave because the "problem" with his sister had not been solved. He soon became depressed, took an overdose of sleeping pills, and was readmitted to Napa's adolescent unit. He started feeling "adjusted" and relaxed all over again.

Defendant left Napa after his 18th birthday in 1973, and held a series of odd jobs. In May 1975, he visited his friend Carol and once had sex with her. He testified that he did not recall having sex with her seven-year-old daughter, Rosa.

Defendant testified that he was convicted of molesting Rosa in 1975 and sent to Atascadero State Hospital (Atascadero). Because he felt he had been placed in the wrong group therapy program, he purportedly requested and received a transfer to state prison.

After his release from prison in 1979, defendant began a sexual relationship with Vesta. He admitted impregnating her daughter, Lakecia, but insisted she consented to sexual intercourse and looked much older than 13 years. He testified that he did not recall having sex with Lakecia's seven-year-old sister, Sheba.

Defendant said he was convicted and imprisoned for molesting Sheba in 1980, and was still on parole when he began living with Lashan's family in 1983.

According to defendant, Lashan came home from school on the day of the crimes and prepared a meal. He helped her with her homework and they watched television. Lashan was sleeping in the bedroom when the two men repossessed the television at 7:30 p.m. Between 8 and 8:15 p.m., defendant smoked "half a joint" and twice tried to call Lashan's parents from the phone booth outside, but could not reach them. At 8:30 p.m., while Lashan was

asleep, defendant assertedly left through the back door and walked to Ruthie's house, resting twice along the way.

Defendant denied stabbing Lashan or confessing to anyone. He believed he was being falsely accused of murder because he had previously been convicted of assaulting young girls. Defendant acknowledged, however, that "there is something wrong with [his] mind" and that he might have committed the crimes and repressed his memory of them. On the other hand, "[n]ot ever being in any trouble concerning violence, and never really being a violent person, [he] couldn't see [himself] killing anyone." Defendant denied being sexually attracted to young girls, but admitted experiencing a strange "light-headed" feeling and hearing a "high-pitched tone" whenever they were near.

3. *Other defense witnesses.* Two psychologists, Dr. Walker and Dr. Haney, agreed that defendant suffers from pedophilia, paranoid personality, and borderline retardation. Dr. Walker testified that defendant: (1) cannot control his sexual preference for children absent intensive therapy, (2) has an IQ of 77, placing him in the lower 5 percent of the population, (3) might be suffering from organic brain damage, even though the results of two EEG's and written tests were inconclusive, and (4) probably committed the murder in a "psychotic" state. Dr. Haney believed defendant would be "reasonably well-adjusted" in prison because he has no history of serious institutional violence and is comfortable in a structured environment. Both psychologists testified that defendant had received "inappropriate" care in the various institutions because they failed to provide individual therapy designed for a paranoid/pedophiliac.

Defendant's mother, Marie, testified that she and defendant's father have been married for 30 years. Defendant, their oldest child, was born when Marie was 17. Defendant's father worked two jobs and the family struggled financially for many years. Marie confirmed that defendant experienced frightening visions as a boy and was a disciplinary problem. She is not convinced of his guilt in this case, and believes he should receive neither death nor life imprisonment.

Mr. and Mrs. Bailey testified that defendant's parents, whom the Baileys have known for 30 years, are hardworking people, dedicated to church and family. The Baileys have fond memories of defendant as a boy, and believe he now deserves "help." Mrs. Bailey stressed that defendant is like a grandson to them, and asked that his life be spared.

Defendant's junior high school teacher testified that defendant was enrolled in a class of mentally retarded students and was often involved in "minor scuffles" at school.[11]

## IV. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

### A. *Steele's Testimony*

Defendant challenges certain rulings limiting impeachment of informant Steele. We find no prejudicial error.

Shortly before Steele took the stand, defendant moved outside of the jury's presence to introduce letters Steele had written to judges in three separate criminal cases pending against him several months before defendant's trial. In the letters, Steele vigorously offered to inform on various people in exchange for leniency, and explained that he feared injury and death in prison and had been threatened with sexual assault in jail. In addition, defendant offered to prove that Steele had threatened witnesses, apparently in the same cases. Defendant argued that the proffered evidence showed Steele was "desperate" to avoid imprisonment and would "do or say anything" to promote his own aims. The trial court refused to admit the evidence on relevance grounds.

As noted, Steele stated on direct examination that he shared a jail cell with defendant while awaiting sentencing for burglary, and that defendant admitted killing Lashan to prevent her from disclosing that he had raped her. Steele also testified as follows: he offered this information to the district attorney on condition he be allowed to serve his sentence in county jail. The offer was rejected and he received a three-year prison term. Steele repeated the offer from prison, conditioning it upon an early parole date. The offer was rejected again. Steele nonetheless met with the district attorney in prison, and relayed everything he purportedly knew about the crimes. Steele further testified that he had been paroled shortly before the instant trial and had received no benefit for his testimony. He simply wanted to "help society" and become a "better" person.

On cross-examination, Steele admitted repeating his request for an early parole date while meeting with the district attorney in prison. Steele also said he knew he could be returned to prison if he "got in trouble" on parole.

In a bench conference held towards the end of Steele's cross-examination, defendant again asked to examine Steele and introduce evidence about the

---

[11]Evidence introduced by the prosecution in rebuttal at the penalty phase will be discussed where pertinent in the opinion.

alleged threats. Later, after the People rested, defendant moved outside of the jury's presence to introduce the letters. Each time, the court invoked its prior ruling and denied the motion.

■ Defendant correctly observes that the court erred in denying his midtrial motion to admit the letters on relevance grounds. Evidence tending to show a witness has some motive, bias, or interest that might induce false testimony has long been a permissible form of impeachment. (Evid. Code, §§ 210, 780, subd. (f); 2 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 1982) § 28.6, pp. 900-913.) Here, Steele insisted that he expected no benefit and was testifying for purely unselfish reasons. The proffered letters implicitly contradicted this claim, and suggested that he had a heightened interest in currying favor with the prosecution on parole and avoiding the risk of harm he associated with imprisonment. (See *People* v. *Dyer* (1988) 45 Cal.3d 26, 49-50 [246 Cal.Rptr. 209, 753 P.2d 1] [witness's status as probationer/ parolee bears on bias].)

■ Defendant also correctly claims the court erred insofar as it excluded, as irrelevant, evidence that Steele had threatened witnesses to prevent them from testifying against him in a legal proceeding. The charged crimes occurred after Proposition 8 added article I, section 28, subdivision (d) to the California Constitution.[12] Hence, statutory rules against impeachment with acts not culminating in a felony conviction and with character traits not bearing directly upon honesty or veracity do not apply. (*People* v. *Harris* (1989) 47 Cal.3d 1047, 1081-1082 [255 Cal.Rptr. 352, 767 P.2d 619]; see Evid. Code, §§ 786-788.) Evidence that Steele threatened witnesses suggests he is the type of person who would harm others and subvert the court's truth-finding process for selfish reasons. Both traits are indicative of a morally lax character from which the jury could reasonably infer a readiness to lie. (See *People* v. *Castro* (1985) 38 Cal.3d 301, 314-315 [211 Cal.Rptr. 719, 696 P.2d 111].)

■ Nevertheless, we reject a related suggestion that by barring cross-examination of Steele about the letters and the alleged threats, the court violated defendant's Sixth Amendment right of confrontation. Defendant emphasizes *Delaware* v. *Van Arsdall* (1986) 475 U.S. 673, 679 [89 L.Ed.2d 674, 683, 106 S.Ct. 1431], which found such error where the defendant had

---

[12]Article I, section 28, subdivision (d) of the Constitution provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding . . . . Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103." Because the charged crimes occurred after June 9, 1982, the effective date of Proposition 8, article I, section 28, subdivision (d) governs defendant's trial. (*People* v. *Smith* (1983) 34 Cal.3d 251, 257-263 [193 Cal.Rptr. 692, 667 P.2d 149].)

been prohibited from asking a prosecution witness about a key fact suggesting bias—dismissal of a criminal charge in exchange for testimony. The high court made clear that no constitutional violation occurs where the excluded testimony could not reasonably have produced "a significantly different impression of [the witness's] credibility . . . ." (*Id.* at p. 680 [89 L.Ed.2d at p. 684]; see *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 750-751, fn. 2 [230 Cal.Rptr. 667, 726 P.2d 113].)

Inquiry into Steele's letters and his alleged threats against witnesses would not have painted a materially different picture of his credibility. Defense counsel implied on vigorous cross-examination that Steele was a manipulative and untrustworthy person, e.g., he had fired several competent attorneys in the burglary case because they advised him to plead guilty, and he had faked being defendant's friend in jail in order to obtain information that could later be used against him. In addition, a motive to fabricate could be inferred from Steele's testimony. Jurors knew he had repeatedly attempted, without official encouragement, to strike a deal with information allegedly obtained from defendant. Jurors also knew Steele was a convicted felon who was testifying under pressure to perform well on parole. No federal constitutional error occurred.

Moreover, even under *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065], exclusion of the impeachment evidence was not prejudicial. For the reasons stated above, Steele's testimony was susceptible of the same basic inferences as the proffered evidence, namely, that he was an untrustworthy person with reason to fabricate. He also played a relatively minor role in the prosecution's otherwise strong circumstantial guilt case. Under the circumstances, reversal of the guilt judgment is not warranted.

### B. *Miranda Claim*

As noted, defendant turned himself in for questioning late February 25, the day after the crimes. Beginning at 10 p.m., he had three consecutive interviews over a four-hour period at the police station. The first and third sessions were with Detectives Reese and McCarthy, and the second one was with Parole Officer Bandettini. Defendant does not dispute that he knowingly and voluntarily waived his *Miranda* rights before speaking with both sets of officials; that all stationhouse statements were properly admitted at trial; and that he never invoked his right to counsel or silence. In the third session, defendant made incriminating statements on the murder, lewd conduct, and arson charges.

Defendant claims the trial court erred in denying his pretrial motion to suppress statements subsequently made in a fourth interview with the

same detectives at Chope hospital. He insists he should have been readvised of his *Miranda* rights at the hospital to ensure that he was capable of remembering the prior warning and deciding to answer more questions. In our view, the court did not err in concluding that the original *Miranda* warnings were "adequate" and that defendant's hospital statements were admissible at trial.

The pertinent facts are as follows: For reasons not clear from the record, defendant was determined to be a suicide risk and hospitalized after his arrest. Detectives Reese and McCarthy arrived at the hospital about 10 a.m. on February 27. A nurse said defendant had a "bad night," but she did not elaborate. The officers entered defendant's room, which was locked from the outside, and saw him sitting on the bed. He looked calm and normal. Reese asked defendant whether he "remembered" them and their "conversation" from the "other night." Defendant said he did. McCarthy asked defendant how he was doing, and defendant replied, "All right." As noted earlier, the officers asked defendant questions for about 10 minutes and elicited a few new details about the fire and stabbing. They ended questioning when a nurse entered to administer medication.[13]

■ As conceded by defendant, readvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver. (*People v. Braeseke* (1979) 25 Cal.3d 691, 701-702 [159 Cal.Rptr. 684, 602 P.2d 384]; *People v. Johnson* (1973) 32 Cal.App.3d 988, 997 [109 Cal.Rptr. 118].) The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights. (See *Martin v. Wainwright* (11th Cir. 1985) 770 F.2d 918, 930-931 [78 A.L.R.Fed. 515]; *Stumes v. Solem* (8th Cir. 1985) 752 F.2d 317, 320-321; *United States ex. rel. Henne v. Fike* (7th Cir. 1977) 563 F.2d 809, 814; *United States v. Hopkins* (5th Cir. 1970) 433 F.2d 1041, 1045; *People v. Quirk* (1982) 129 Cal.App.3d 618, 630 [181 Cal.Rptr. 301]; *People v. Booker* (1977) 69 Cal.App.3d 654, 665 [138 Cal.Rptr. 347]; *People v. Bennett* (1976) 58 Cal.App.3d 230, 238-239 [129 Cal.Rptr. 679]; *People v. McFadden* (1970) 4 Cal.App.3d 672, 687 [84 Cal.Rptr. 675].)

---

[13]We note that none of defendant's extrajudicial statements was tape-recorded. On the first night of questioning, Reese decided, based on 18 years' experience with the police force, not to use a tape recorder because defendant seemed "nervous" and might have been "distracted" by the machine. Instead, McCarthy took extensive notes of statements defendant made to the officers at both the police station and Chope hospital. Reese reviewed the notes while the interviews were fresh in his mind and, like McCarthy, testified that they were "accurate." Defendant's stationhouse interview with his parole officer was not transcribed.

■ Here, the hospital interview occurred only 36 hours after defendant had twice received and twice waived his *Miranda* rights. (See *Martin* v. *Wainwright, supra,* 770 F.2d at pp. 930-931 [readvisement unnecessary one week later].) It was clear from the circumstances that defendant was still in official custody. He was familiar with the criminal justice system and could reasonably be expected to know that any statements made at this time might be used against him in the investigation and any subsequent trial. Indeed, the hospital interview was conducted by the same two officers who had interrogated defendant and placed him under arrest at the police station. By asking whether he "remembered" them and the prior "conversation," the officers implied that they were simply tying up loose ends from the earlier "Mirandized" session. Nothing in the record indicates that defendant was mentally impaired or otherwise incapable of remembering the prior advisement and deciding to answer a few more questions. Under these facts, no *Miranda* violation occurred.

## C. *Defendant's Prior Felony Convictions*

■ Defendant claims the trial court erred in finding his prior felony convictions admissible for impeachment. We disagree.

Before the October 1984 guilt trial, defendant moved to preclude impeachment with his 1975 lewd conduct conviction and 1980 child cruelty conviction. He argued that the prior convictions were "too similar" to the sole special-circumstance allegation of murder in the commission of a lewd and lascivious act upon a minor. (See Evid. Code, § 352; *People* v. *Beagle* (1972) 6 Cal.3d 441, 453 [99 Cal.Rptr. 313, 492 P.2d 1].) The prosecutor replied that addition of article I, section 28, subdivision (f) to the California Constitution by Proposition 8 eliminated all restrictions on the admissibility of prior convictions for impeachment, including the court's traditional power to exclude prejudicial evidence.[14] Without comment, the court denied defendant's motion.

Defendant did not testify at the guilt phase. The first degree murder charge was submitted to the jury on theories of premeditated murder and murder in the commission or attempted commission of a lewd act. Defendant was convicted, as charged, of first degree murder and arson, and the special circumstance was found true.

In October 1985, before the start of the penalty phase, defendant moved for a new trial under *People* v. *Castro, supra,* 38 Cal.3d 301 (*Castro*), which

---

[14]Article I, section 28, subdivision (f) of the Constitution provides that "[a]ny prior felony conviction of any person in any criminal proceeding . . . shall subsequently be used *without limitation* for purposes of impeachment . . . ." (Italics added.) This provision governs defendant's trial because, as noted earlier, the charged crimes occurred after the effective date of Proposition 8. (*People* v. *Smith, supra,* 34 Cal.3d 251, 257-263.)

was decided after the guilt verdict was rendered. Defendant conceded in the motion—as he does on appeal—that his prior convictions involve moral turpitude and are "prima facie admissible" under *Castro*. (*Id.* at pp. 315-316; see *People* v. *Massey* (1987) 192 Cal.App.3d 819, 823 [237 Cal.Rptr. 734].) He argued, however, that the court erred in failing to exercise its discretion to exclude the priors as substantially more prejudicial than probative, and that he had been kept off the stand as a result. (*Castro*, *supra*, 38 Cal.3d at pp. 306-316 [plur. opn. of Kaus, J.], 322 [conc. & dis. opn. of Grodin, J.], 323-332 [conc. & dis. opn. of Bird, C. J.].)

At the hearing on the new trial motion, the court announced that it had exercised its *Castro* discretion and determined that its pretrial decision to admit the prior convictions was correct. The court then denied the motion.

■ We first reject the Attorney General's suggestion that defendant has waived the right to challenge this ruling. Although *People* v. *Collins* (1986) 42 Cal.3d 378, 383-388 [228 Cal.Rptr. 899, 722 P.2d 173] (*Collins*), requires a defendant to testify in order to raise a *Castro* claim of improper impeachment on appeal, this rule applies to trials beginning after *Collins* became final. Where, as here, the case was tried before *Collins*, it is governed by prior law enabling a defendant to raise such a claim even though he did not testify or make an offer of proof. (*Collins*, *supra*, 42 Cal.3d at p. 388, citing *People* v. *Fries* (1979) 24 Cal.3d 222, 232-234 [155 Cal.Rptr. 194, 594 P.2d 19].)

■ Nevertheless, we reject defendant's claim that the guilt judgment should be reversed on abuse-of-discretion grounds. At the hearing on the new trial motion, the prosecution indicated that it never intended to introduce the facts underlying the 1980 child cruelty conviction—forcible rape—if it were admitted for impeachment. The court could reasonably conclude that the sanitized version would not have tainted the instant verdict. While defendant's 1975 lewd conduct conviction is similar to certain elements of the charged crimes, it was almost 10 years old at the time of the guilt trial. The court could reasonably conclude that it was neither so recent as to prejudice defendant, nor so remote as to have no bearing on his credibility.[15]

---

[15]We note that in their briefs at trial and on appeal, the parties state that defendant's oldest conviction, involving lewd conduct against Rosa S., occurred in 1977. While the abstract of judgment bears a 1977 date, the verdict was actually rendered by the jury in 1975, the same year the crime was committed and tried. We infer from defendant's testimony at the penalty trial that he underwent psychological evaluation and/or treatment at Atascadero during this time. In any event, the different dates on documents concerning this conviction almost certainly did not affect the court's decision to admit it under *Castro*, *supra*, 38 Cal.3d 301.

Defendant insists the case should at least be remanded so that the trial court—which had heard the prosecution's evidence when making its belated *Castro* ruling—can reassess the issue after hearing what his own testimony would have been. (See *Collins, supra,* 42 Cal.3d 378, 394, fn. 20.) However, no *"Collins* remand" is necessary. We can determine from the existing record that defendant was not prejudiced by the court's failure to consider his probable testimony, or by his failure to testify at the guilt phase.

Defendant argues that, had he testified on the issue of guilt, he could have rebutted the prosecution's claims of premeditated murder and lewd conduct supporting the first degree murder and special circumstance charges. However, defendant concedes his guilt phase testimony would have conformed to testimony actually given under oath at the penalty trial. There, he denied committing the crimes or being present at the motel when they occurred. This alibi defense has no bearing on whether defendant was properly found guilty of first degree murder with a special circumstance, as opposed to other possible offenses arising out of the motel incident.[16]

Moreover, this alibi defense is inherently implausible. Defendant admitted at the penalty trial, and an eyewitness confirmed, that defendant was present at the motel throughout the day on February 24 and until 8:30 p.m. Medical evidence established that the stabbing most likely occurred at that time. There was no evidence suggesting that a third person had gained entry to the motel and stabbed Lashan. No witness other than defendant could account for his whereabouts between 8:30 and 9:50 p.m., giving him ample time to commit the crimes and walk to Ruthie's house. In addition, defendant's version of events at trial was implicitly undermined by four witnesses who said he had admitted involvement in the motel crimes (i.e., two police officers, a nurse, and an informant).

Under the circumstances, it is not reasonably probable that the outcome of the guilt trial would have been different if defendant had testified absent fear of impeachment with his prior convictions. The court's decision to admit them for that purpose was harmless.

D. *Jury Note on Murder Instructions*

The jury received standard instructions defining murder, malice afore-thought, first degree premeditated murder, first degree felony murder, second

---

The court did not explicitly factor age into its analysis, and the two-year discrepancy does not materially alter the prejudice/probative balance.

[16]Defendant erroneously claims he testified at the penalty phase that he killed Lashan as the result of an "uncontrollable impulse" and that no sexual misconduct occurred. Although he told *police* he had "sex" with Lashan and "unintentionally" stabbed her, he denied any involvement in the motel crimes at *trial*.

degree murder, and voluntary and involuntary manslaughter. Two hours after it retired to deliberate, the jury sent the court a note asking for "a summarized definition of the charges of murder. First Degree, Second Degree." In the presence of the court clerk and reporter, but without notifying counsel, the court wrote the following sentence on the note and returned it to the jury: *"If you wish to be brought back into court, I will reread the information to you."* (Italics added.) The jury never responded to the court's offer.

■ Defendant claims the court breached section 1138, which states that any "information" requested by the jury during deliberations must be given "in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called." For similar reasons, defendant insists the court violated his Sixth Amendment right to counsel.

While the preferable practice is to notify counsel of all mid-deliberation jury inquries, the trial court did not err here. A statutory or constitutional violation occurs only where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel. (See, e.g., *People* v. *Jennings* (1991) 53 Cal.3d 334, 382-384 [279 Cal.Rptr. 780, 807 P.2d 1009]; *People* v. *Hogan* (1982) 31 Cal.3d 815, 848-849 [183 Cal.Rptr. 817, 647 P.2d 93].) Here, the court simply offered to provide further instruction in open court, presumably after proper notice to counsel. The offer was not accepted, and no murder instructions were actually given after the jury retired to deliberate.

Defendant makes the alternative claim that his Fifth Amendment right to a fair trial was violated by the lack of further instruction. We disagree. Jurors never responded to the court's offer to "reread the information" they had requested. Defendant's suggestion that this offer confused the jury into remaining silent is speculative and implausible. We can only assume that the jury, upon reflection, was satisfied with the original murder instructions. (See, e.g., *People* v. *Beardslee* (1991) 53 Cal.3d 68, 97-98 [279 Cal.Rptr. 276, 806 P.2d 1311].) No error occurred.

### E. *Failure to Instruct Sua Sponte on Attempt*

The jury was instructed that defendant could be found guilty of first degree felony murder if the killing occurred during the *"commission of or attempt to commit"* a lewd and lascivious act upon a child under the age of 14. (Italics added.) However, the information, instructions, and written verdict form stated that the jury could find the special circumstance to be true if the killing occurred while defendant was "engaged in the *commission*

*of"* a lewd act. (Italics added.) The jury received an instruction defining lewd and lascivious conduct under section 288, subdivision (a) (section 288(a)). No instruction defining attempt was given. As mentioned earlier, defendant was convicted of first degree murder and arson, and the special circumstance was found true.

■ Defendant insists the trial court erred prejudicially by failing to instruct sua sponte on the elements of attempt. He argues that absent such an instruction, the jury was left to speculate that some act other than an attempt was sufficient to satisfy the first degree felony-murder charge. Defendant also claims the omission might have misled jurors to believe that they could apply the same erroneous "attempt" theory to the special circumstance allegation.

Even if the attempt instructions were incomplete, no prejudice occurred. The prosecutor argued at the close of the guilt phase that defendant unlawfully committed two lewd acts upon Lashan shortly before the murder, namely, compulsory disrobing and forcible rape. (See *People* v. *Austin* (1980) 111 Cal.App.3d 110, 114-115 [168 Cal.Rptr. 401] (*Austin*), and discussion, *post.*) No attempt theory was urged. Similarly, the information, instructions, and verdict form spoke only in terms of a completed lewd act at the special circumstance phase. Because jurors found the special circumstance to be true, they necessarily found such a completed act, and thereby foreclosed any speculation that they based either the first degree murder verdict or the special circumstance finding on some unknown, incorrect theory of attempt. (See *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

Defendant suggests the special circumstance finding does not conclusively resolve the attempt question. He argues that because jurors were instructed to reach a verdict on the murder charge before turning to the special circumstance allegation, they might have been "thinking in terms of an attempt" for each offense. We are not persuaded. The instructions on all charges were read at the same time. We assume the jury followed the special circumstance instruction and found actual commission of a lewd and lascivious act.

F. *Austin Instruction*

Consistent with the language of section 288(a), the jury was told that defendant could be found guilty of a lewd and lascivious act if he touched a child under age 14 *"with"* the specific intent to sexually arouse either party.

(Italics added.)[17] A touching which occurred through the child's clothing or on the bare skin was said to be sufficient.

At the prosecutor's request, the jury also learned that it could find commission of an unlawful lewd act if defendant "compel[led] [the child] to remove [his or her] own clothing, *and* [defendant had the requisite specific intent]. No touching of the child by [defendant] is required." (Italics added.) This instruction was based on *Austin, supra,* 111 Cal.App.3d 110, 115. (See also *People* v. *Meacham* (1984) 152 Cal.App.3d 142, 153-154 [199 Cal.Rptr. 586].) Defendant objected to it on undisclosed grounds below.[18]

Defendant does not suggest that the actual or constructive disrobing of a child by the accused cannot constitute a lewd act as a matter of law. Where committed for a sexually exploitative purpose, such conduct is presumptively harmful and prohibited by section 288(a).

Defendant's main complaint is that, by using "and" rather than "with" to define the necessary relation between act and intent, the *Austin* instruction, as given, might have misled jurors to believe that the sexual intent could have been focused solely on "some future unrealized act." However, no reasonable jury would adopt this construction. It was manifest from the special instruction itself that the constructive disrobing and sexual intent must coincide in order for a crime to occur. The instructions also indicated in at least three other places that a physical touching accomplished "with" such intent violates section 288(a). Contrary to what defendant argues, this language fully informed the jury that defendant could not be convicted on a "disrobing" theory unless he intended to give or receive immediate sexual gratification from that activity. No error occurred.

---

[17]Section 288(a) prohibits the commission of "any lewd or lascivious act" upon the body of a child under age 14 "with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of the child."

[18]The instructions defined a section 288(a) offense as follows: "[E]very person who wilfully and lewdly commits any lewd or lascivious act upon or with the body, or any part or member thereof, of a child under the age of 14 years, *with* the specific intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of such person or of such child, is guilty of the crime of committing a lewd or lascivious act upon the body of a child. [¶] A lewd or lascivious act is defined as any touching of the body of a person under the age of 14 years *with* the specific intent [described above]. [¶] To constitute a lewd or lascivious act it is not necessary that bare skin be touched. The touching may be through the clothing of the child. [¶] *Where a person compels a child under the age of 14 to remove the child's own clothing, and that person has the specific intent [described above], such person may be guilty of a lewd or lascivious act in violation of [section 288(a)]. No touching of the child by the person is required.* . . . [¶] [E]ach of the following elements must be proved: (1) that a person committed a lewd or lascivious act upon the body of a child, (2) that the child was under 14 years of age, and (3) that such act was committed *with* the specific intent [described above]." (Italics added.) The italicized sentence was based on *Austin, supra,* 111 Cal.App.3d 110, 114-115.

## G. *Special Finding*

At defendant's request, the jury was told that it must "unanimously agree on the particular [lewd] act or acts" found to support the special circumstance charge, and that it must "set forth" any such act in writing on the verdict form.[19]

Two and a half hours after deliberations began, the jury sent the court the following note: "Must we comment [on] and explain the specific lewd or lascivious act? [The verdict] form seems to call for an entry." In the presence of the clerk and reporter, but without notifying counsel, the court wrote the word "yes" on the note and returned it to the jury.

The verdict form supplied by defendant and ultimately signed by the jury contained preprinted language stating that the special circumstance claim of murder "in the commission of" a lewd act was "true." In a blank space calling for a description of the "specific lewd or lascivious act(s)" committed by defendant, the jury wrote, "*witnessed by the victim*[']s nudity and obvious use of force." (Italics added.)[20] Defendant moved to strike this finding on grounds it did not state a violation of section 288(a) as a matter of law. The court denied the motion.

Defendant raises several claims concerning the foregoing events, none of which has any merit. He first argues that the court erred in answering the jury's inquiry about the special circumstance verdict without prior notice to counsel. (Citing § 1138; *People v. Hogan, supra,* 31 Cal.3d 815, 848-849.) While the court technically erred, no prejudice occurred under any applicable standard. The court's one-word answer simply directed the jury to

---

[19]The jury was instructed in pertinent part: "If you find [defendant] guilty of murder of the first degree, you must then determine if [the] murder was committed under the following special circumstance[,] to wit[,] while the defendant was engaged in the commission of a lewd and lascivious act upon [Lashan], a child under the age of 14 years. [¶] A special circumstance must be proved beyond a reasonable doubt. [¶] If you have a reasonable doubt as to whether [the] special circumstance is true, it is your duty to find that it is not true. [¶] *In order to find the special circumstance charged in this case to be true or untrue, you must agree unanimously. If you find the special circumstance to be true, you must also unanimously agree on the particular act or acts committed.* [¶] *You will include in your verdict*[,] *on a form that will be supplied*[,]*your finding as to whether the special circumstance is or is not true. If true, the specific act or acts constituting the special circumstance shall be set forth by you on that special verdict.*" (Italics added.) Defendant supplied the italicized language.

[20]The special circumstance verdict stated: "We, the jury in the above entitled cause, find the special circumstance charged in the Information filed herein, that the murder of [Lashan] was committed by [defendant] while [he] was engaged in the commission of the crime of child molest[ation] within the meaning of Penal Code section 190.2(a)(17)(v) to be true, and the specific lewd or lascivious act(s) committed upon [Lashan] by the defendant to be: *witnessed by the victim*[']*s nudity and obvious use of force.*" (Italics added.) The jury inserted the italicized language.

follow defense instructions previously given, requiring unanimous overt agreement on any lewd act found to support the special circumstance charge.

██ Defendant next argues that the special circumstance must be set aside because the jury ambiguously described the lewd act attributed to defendant. He suggests that unanimous agreement on the nature of the act was never reached.

However, the jury obviously agreed that a lewd and lascivious act had occurred under one of two viable, closely connected theories, i.e., that defendant either forcibly undressed Lashan or forcibly compelled her to undress herself. (See discussion, *ante.*) Any asserted failure to identify or unanimously select one of these factual scenarios is immaterial. As we have recently observed, the requirement of jury unanimity in criminal cases is of constitutional origin. (*People* v. *Jones* (1990) 51 Cal.3d 294, 321 [270 Cal.Rptr. 611, 792 P.2d 643], citing Cal. Const., art. I, § 16.) It is primarily intended to ensure that jurors agree upon a particular act where evidence of more than one possible act constituting a charged criminal offense is introduced. (*Jones, supra,* 51 Cal.3d at pp. 321 [maj. opn. of Lucas, C. J.], 327 [dis. opn. of Mosk, J.].) Contrary to defendant's suggestion here, the unanimity rule does not extend to the minute details of how a single, agreed-upon act was committed. (See *People* v. *Beardslee, supra,* 53 Cal.3d 68, 92-94.)[21]

██ Defendant also claims there was insufficient evidence to support the special circumstance finding on a "disrobing" theory. We disagree. The evidence established that 12-year-old Lashan was extremely modest, that she never relaxed in the nude at home, and that she undressed at night only under parental compulsion. Nothing unusual was noticed about her appearance when she was last seen alive watching television at 7:30 p.m. Thus, the jury could reasonably infer that Lashan was clothed an hour later, when the stabbing most likely occurred. However, her body was found in the nude and bore signs of a violent struggle or assault. A rational trier of fact could conclude that, at a minimum, the murder occurred during a sexually motivated, compulsory act of disrobing. (§§ 190.2, subd. (a)(17)(v), 288(a); *Austin, supra,* 111 Cal.App.3d 110, 114-115; see *People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

---

[21]Although the special finding in this case is not fatally flawed, we strongly caution trial courts against using verdict forms that allow lay jurors substantial leeway in wording special findings.

### H. *Corpus Delicti*

■ In *People* v. *Mattson* (1984) 37 Cal.3d 85, 93-94 [207 Cal.Rptr. 278, 688 P.2d 887] (*Mattson I*), we held that the corpus delicti rule—requiring the prosecution to establish that a crime occurred independent of the accused's extrajudicial statements—applies to felony-murder special circumstance allegations. *Mattson I* relied upon statutory language stating that such felonies must be proved "pursuant to the general law applying to the trial and conviction of the crime." (§ 190.4, subd. (a) [1977 and 1978 death penalty laws]; but see § 190.41.)[22]

The day after *Mattson I* was decided, the jury in this case was instructed that defendant could not be convicted of "a criminal offense" unless there was "some proof of each element of the crime independent of any confession or admission made by him outside of this trial. *This rule does not apply to proof of the special circumstance . . . .*" (Italics added.)[23] The italicized language was given at the prosecutor's request, and was based on dictum in *People* v. *Sanders* (1983) 145 Cal.App.3d 218, 223 [193 Cal.Rptr. 331]. Defendant objected to its use, but did not state his reasons. Apparently, neither the court nor counsel were aware that *Mattson I* had expressly disapproved *Sanders* on this point. (37 Cal.3d at p. 94, fn. 4.)

Defendant now argues that, by denying him a state-created entitlement to a jury trial on the corpus delicti of the special circumstance, the "anti-*Mattson*" instruction violated his due process rights under the Fifth Amendment. (See *Hicks* v. *Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 180, 100 S.Ct. 2227].) He insists the error cannot be held harmless beyond a reasonable doubt because the corpus delicti of a lewd act was not established independent of his extrajudicial statements. Defendant does not dispute that

---

[22]Section 190.41 was recently enacted by voter initiative. (See Ballot Pamp., Proposed Stats. and Amends. to Cal. Const. with arguments to voters, Primary Elec. (June 5, 1990), Prop. 115, text of proposed law, p. 67.) It effectively overturns *Mattson I, supra,* 37 Cal.3d at pages 93-94, by providing that the corpus delicti of felony-based special circumstances enumerated in section 190.2, subdivision (a)(17) "need not be proved independently of a defendant's extrajudicial statement." We recently relied upon state rules of statutory construction and upon the constitutional prohibition against ex post facto legislation to conclude that section 190.41 applies only to crimes committed after its effective date. (*Tapia* v. *Superior Court* (1991) 53 Cal.3d 282, 297-298 [279 Cal.Rptr. 592, 807 P.2d 434].)

[23]The jury received the following corpus delicti instruction: "No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any confession or admission made by him outside of this trial. [¶] *This rule does not apply to the special circumstance,* the special allegation, or degree of the murder charged in the information. [¶] The identity of the person who is alleged to have committed a crime is not an element of the crime[,] nor is the degree of the crime. Such identity or degree of the crime may be established by an admission or a confession." (Italics added.) Defendant objects to the italicized language.

under *Mattson I* and its progeny, only a prima facie showing permitting a reasonable inference that a crime occurred is sufficient. Such evidence need not connect the defendant to the crime. (*People v. Wright* (1990) 52 Cal.3d 367, 404 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Alcala* (1984) 36 Cal.3d 604, 624-625 [205 Cal.Rptr. 775, 685 P.2d 1126].)

Even under the standard of prejudice urged by defendant, no reasonable jury properly instructed under *Mattson I, supra,* 37 Cal.3d 85, would have reached a different result on the felony-murder special-circumstance allegation. Here, the naked body of a girl under age 14 was found with semen in her vagina and with other injuries indicative of a violent assault. These facts give rise to a strong inference that an unlawful sexual touching occurred. This inference satisfies the corpus delicti rule. (*People v. Mattson* (1990) 50 Cal.3d 826, 874-875 [207 Cal.Rptr. 278, 688 P.2d 887] [nine-year-old murder victim found naked from the waist down with lacerated hymen and other injuries].)

In any event, the record discloses that the jury did not rely on defendant's extrajudicial statements in finding the special circumstance to be true. In statements to police and informant Steele, defendant claimed to have engaged in a "sex" act with Lashan, i.e., "rape." He also told police that she was clothed—"had a dress on"—at the time of the stabbing and presumably the sexual assault. However, the jury identified the lewd act underlying the special circumstance as a compulsory act of disrobing. This special finding forecloses any possibility that the jury relied upon defendant's extrajudicial admissions. (See *People v. Sedeno, supra,* 10 Cal.3d 703, 721.)

V. COMPETENCE PHASE ISSUES

A. *Interlocutory Appeal*

As mentioned earlier, defendant was found competent to stand trial in a separate proceeding held after the guilt verdict was rendered but before the penalty trial began. Defendant, acting in propria persona, immediately filed a notice of appeal from the competence determination in the Court of Appeal. We eventually transferred that appeal here, and consolidated it with the instant appeal from the death judgment. No appellate briefs were filed below. Defendant raises certain challenges to the competence proceeding in the automatic appeal.

We conclude that the verdict finding defendant competent is a nonappealable, interlocutory ruling. It may be reviewed on appeal only from a final judgment in the underlying criminal proceeding. (*People v. Fields* (1965) 62 Cal.2d 538, 541-542 [42 Cal.Rptr. 833, 399 P.2d 369, 16 A.L.R.3d

708]; see §§ 1237, subd. (a), 1370, subd. (a); see also *Vardas* v. *Estelle* (5th Cir. 1983) 715 F.2d 206, 208, cert. den. 465 U.S. 1104 [80 L.Ed.2d 133, 104 S.Ct. 1603] [no constitutional right of direct appeal from a competence determination].)

Hence, we will dismiss the interlocutory appeal and consider defendant's competence phase challenges as part of the appeal from the death judgment.

B. *Attorney-client Privilege*

Defendant argues that evidence offered in his case-in-chief on competence was erroneously excluded under the attorney-client privilege. His claim lacks merit.

The guilt verdict was returned in October 1984. Judge Smith presided at both the guilt and penalty trials.

In November 1984, before the penalty trial began, defense counsel Barnett and O'Malley appeared before Judge Knight and moved for a competence hearing. Barnett said he "question[ed]" defendant's "ability to make intelligent and effective choices," and to "cooperate in his own defense." Without comment, Judge Knight granted the motion. Criminal proceedings were suspended and psychiatrists were appointed to examine defendant. Attorney Digiacinto was appointed to represent defendant at the competence phase.

The competence hearing took place over a three-day period in June 1985. A new jury was empaneled. Temporary Judge Browning presided at the hearing pursuant to the oral and written stipulation of the parties.

At the start of the hearing, Digiacinto called trial counsel Barnett to the witness stand. The following events occurred outside of the jury's presence: the prosecutor objected to Barnett's testimony on grounds he might reveal confidential communications in violation of defendant's attorney-client privilege. The court deferred ruling on the issue and allowed Barnett to answer preliminary questions. When ultimately asked for his opinion on defendant's present competence to stand trial, Barnett said he "could not" answer unless defendant personally waived the attorney-client privilege and "possibly the doctor-patient privilege."

The court asked defendant whether he understood Barnett's answer. Defendant said, "yes." The court explained that, in order to answer questions about defendant's mental condition, Barnett might be required to disclose privileged communications. Defendant twice replied that he would not waive

the privilege. The court then advised defendant that his decision might prevent Barnett from giving favorable testimony in defendant's behalf, but that the court did not actually know what Barnett would say. The court asked defendant whether he wished to consult privately with Digiacinto. Defendant said, "yes."

After the meeting, the court again asked defendant whether he understood that he had the right to prevent Barnett from disclosing confidential "conversations" or "knowledge" obtained through defendant or mental health experts. Defendant indicated that he did. The court asked defendant whether he waived the privilege. Defendant said, "no."

Digiacinto made the following statement: "I find myself . . . between a rock and a hard place. [¶] [T]he only evidence which could be [ad]duced on [defendant's] behalf is Mr. Barnett's testimony. Not having that testimony is in effect a deprivation of [defendant's right to a competence] hearing. *At the same time, how can anybody [with] a Bar card advise him otherwise*[?]" (Italics added.)

The court then sustained defendant's assertion of the privilege. It noted that because defendant is presumed competent and bears the burden of proving his incompetence, he is "presumed, ergo, to have the mental ability to form a reasoned opinion as to whether to waive his privilege or not." (See § 1369, subd. (f).)[24]

The jury returned to the courtroom. The defense rested. The prosecution called the two court-appointed psychiatrists, Drs. Small and Bryan. Both testified that they had recently examined defendant and found him mentally able to understand the proceedings and assist counsel. A deputy sheriff also described defendant's excellent behavior in jail over the preceding year. The jury found defendant competent to stand trial. (See § 1367.)[25]

 Defendant argues that the court erred in presuming him competent to assert the attorney-client privilege over Digiacinto's objection. Defendant insists that by granting the motion for a competence hearing, the court implicitly expressed a "doubt" as to his competence. (See § 1368, subd.

---

[24]Section 1369, subdivision (f) states in part: "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent. The verdict of the jury shall be unanimous." Here, this principle was communicated to the jury in a special instruction requested by *defendant*.

[25]Section 1367 provides that an accused is mentally incompetent to stand trial if, "as a result of mental disorder or developmental disability, [he] is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

(a);[26] see also *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942] [due process mandates a § 1368 hearing where there is substantial evidence of incompetence].) Such "doubt," defendant argues, rendered him presumptively incapable of personally deciding whether to exercise any right or privilege during the competence phase.

Defendant relies primarily upon *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485] (*Samuel*), which reversed a criminal conviction because there was insufficient evidence to support an earlier competence verdict. On a separate point, *Samuel* observed that counsel had waived any objection defendant might otherwise have made to admission of an illegally obtained confession at the competence trial. *Samuel* assumed that "defendant's attorney must play a greater role in making fundamental choices for him, and cannot be expected to seek approval of strategic decisions made in the course of obtaining and presenting proof of incompetence. . . . [I]f counsel represents a defendant as to whose competence the judge has declared a doubt sufficient to require a section 1368 hearing, he should not be compelled to entrust key decisions about fundamental matters to his client's apparently defective judgment." (29 Cal.3d at p. 495.)

We have not relied on this dictum in the decade since *Samuel* was decided. (But see *Shephard* v. *Superior Court* (1986) 180 Cal.App.3d 23, 30-31 [225 Cal.Rptr. 328]; *People* v. *Bolden* (1979) 99 Cal.App.3d 375, 379-380 [160 Cal.Rptr. 268].) And, *Samuel* did not confront the presumption of competence in section 1369, subdivision (f). We recently upheld this statutory presumption against a due process claim that it unfairly requires a defendant who might be incompetent to shoulder the burden of establishing his condition. (*People* v. *Medina* (1990) 51 Cal.3d 870, 881-885 [274 Cal.Rptr. 849, 799 P.2d 1282].)[27]

Whatever the continuing validity of *Samuel*, *supra*, 29 Cal.3d 489, it certainly does not apply here. First, no unequivocal objection to application of the privilege was made below. After defendant consulted with Digiacinto and refused to waive the privilege one last time, Digiacinto essentially told

---

[26]Section 1368, subdivision (a) states that if "a doubt arises in the mind of the judge as to the mental competence of the defendant," the court shall inquire of defense counsel regarding the defendant's competence. Subdivision (b) of the same section provides that if counsel believes defendant may be incompetent, the court shall order a hearing on the matter, and even if defense counsel believes his client is competent, the court may, in its discretion, order a competence hearing. Once the hearing is ordered, "all proceedings in the criminal prosecution shall be suspended until the question of [defendant's] present mental competence has been determined." (*Id.*, subd. (c).)

[27]Defendant makes the same due process claim that we thoroughly discussed and rejected in *People* v. *Medina*, *supra*, 51 Cal.3d 870, 881-885. We see no reason to reconsider that analysis here.

the court that both he and Barnett had no choice but to respect defendant's decision.[28] Hence, the point has not been preserved for appeal.

In addition, nothing in the appellate record suggests that defendant's refusal to waive the attorney-client privilege was the product of impaired or "defective judgment." (*Samuel, supra,* 29 Cal.3d 489, 495.) Contrary to Justice Kennard's view of the record in this case, the trial court obviously ordered a competence hearing in an overabundance of caution, and not because it was statutorily or constitutionally compelled to do so. (*People* v. *Laudermilk* (1967) 67 Cal.2d 272, 283, fn. 10 [61 Cal.Rptr. 644, 431 P.2d 228] [discretion to grant hearing].) The court never expressed a doubt as to defendant's competence on the record. (See *People* v. *Marks* (1988) 45 Cal.3d 1335, 1340-1341 [248 Cal.Rptr. 874, 756 P.2d 260]; *People* v. *Hale* (1988) 44 Cal.3d 531, 540-541 [244 Cal.Rptr. 114, 749 P.2d 769].) And, no evidence of incompetence was introduced before or during the competence hearing. (See *People* v. *Stankewitz* (1982) 32 Cal.3d 80, 91-92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Laudermilk, supra,* 67 Cal.2d at p. 283.) Defendant's statements to the court about the attorney-client privilege were coherent and precise, and strongly suggested that he was capable of deciding whether to assert it. No error occurred.[29]

In any event, defendant was not prejudiced by the court's decision to sustain the privilege. Both psychiatrists concluded that defendant was competent to stand trial, and neither one diagnosed him as suffering from a serious mental disorder. It is not reasonably probable that Barnett's uncor-

---

[28]The "model provision" on competence procedures set forth in the American Bar Association's Standards for Criminal Justice supports this position. Standard 7-4.8(b) provides: "Evidence presented at the hearing should *conform to rules of evidence applicable to criminal cases* within that jurisdiction. . . . [¶] (i) Defense counsel may elect to relate to the court personal observations of and conversations with the defendant *to the extent that counsel does not disclose confidential communications or violate the attorney-client privilege.* . . . [¶] (ii) The court may properly inquire of defense counsel about the professional attorney-client relationship and the client's ability to communicate effectively with counsel. The defense counsel, however, *should not be required to divulge the substance of confidential communications or those that are protected by the attorney-client privilege.*" (2 ABA Standards for Criminal Justice, std. 7-4.8 (2d ed. 1986) p. 7.208, italics added; see also *id.,* com. to std. 7-4.8, at p. 7.213.)

[29]Justice Kennard also states that trial counsel Barnett could necessarily have answered the question calling for an opinion on defendant's competence without disclosing confidential information. However, Barnett made clear that he did not believe he "could" do so and defendant apparently agreed. Under the circumstances, the trial court was not obliged—and indeed might not have been authorized—to inquire further whether any answer by Barnett might have implicated the privilege. We also decline to second-guess the trial court's implicit determination that this assertion of the privilege was sincere. Moreover, even if Barnett's answer did not disclose on its face that his opinion depended upon confidential communications, the door might thereby have been opened for prosecutorial inquiry into the basis of the opinion. (*People* v. *Dubrin* (1965) 232 Cal.App.2d 674, 680 [43 Cal.Rptr. 60].)

roborated lay opinion would have convinced the jury otherwise. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## C. *Excluded Rebuttal Evidence*

On cross-examination by defendant, both psychiatrists testified that they had never appeared as witnesses in the penalty phase of a capital trial and knew little about the evidence typically admitted therein. (See § 190.3.) Over the prosecutor's relevance objection, the witnesses were asked whether they had considered the seriousness of defendant's crimes, the possibility that a wide range of evidence might be introduced, and the possibility that a death sentence might be imposed before declaring defendant competent. Dr. Small explained that such considerations did not affect his determination that defendant was able to understand the proceedings and communicate rationally with counsel. Dr. Bryan said that, while the severity of possible sentences might increase defendant's mental strain during trial, he (Bryan) had taken this fact into account before finding defendant competent.

After the People rested, defendant called an attorney, John Balliet, to the stand. Outside of the jury's presence, defendant argued that Balliet was an expert in California death penalty law and would testify about the "kind of cooperation" needed between a capital defendant and counsel, and the "varieties of evidence" admissible at the penalty phase. The prosecutor argued that Balliet's testimony was irrelevant because section 1367 does not differentiate among types of crimes or trials in defining competence. The court excluded the evidence under Evidence Code section 352.

Defendant now argues that the court abused its discretion and violated his federal constitutional right to a fair trial. In defendant's view, Balliet's testimony should have been admitted because it deeply undermined the prosecution's mental evidence.

We disagree. Both psychiatrists made it clear that the concerns Balliet might discuss did not affect their assessment of defendant's mental capacity to stand trial. And, nothing in the offer of proof indicated that Balliet would describe the particular facts or complexities of this case. The court could reasonably conclude that the probative value of Balliet's testimony was low, while the risk of undue delay and jury confusion was high. No error occurred.

## D. *"Cumulative" Effect of Alleged Errors*

Defendant argues that the "cumulative" effect of the following trial court "errors" casts fatal doubt on the reliability of both the competence and

death verdicts: (1) placing the burden of proof of incompetence upon defendant, (2) sustaining the attorney-client privilege so as to preclude testimony by trial counsel Barnett, and (3) excluding rebuttal testimony by Attorney Balliet concerning the nature of a penalty trial. As we have explained, the court did not err in making these rulings. Defendant's sweeping claim of prejudice fails.

## VI. PENALTY PHASE ISSUES

### A. *Evidence in Aggravation*

Defendant raises several challenges to evidence admitted during the prosecution's case-in-chief at the penalty phase. For the most part, defendant relies on the general notion that such evidence must bear on a specific aggravating factor. (See § 190.3; *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782].) As we will explain, no prejudicial error occurred in this post-*Boyd* penalty trial.

Defendant first contends the court erred in admitting evidence that he transmitted gonorrhea to: (1) the three young victims of his prior forcible sexual assaults—Rosa, Sheba, and Lakecia—in 1975 and 1979, (2) Rosa's mother, Carol, in 1975, and (3) Ruthie, defendant's girlfriend at the time of the capital crimes in 1983. Defendant claims his transmission of gonorrhea to various victims and partners is irrelevant absent evidence that he actually knew he carried the disease before each forcible sexual assault occurred. He also implies the evidence should have been excluded as unduly prejudicial.

Defendant has waived these claims. While several witnesses testified about the circumstances under which they discovered the disease, defendant never objected on grounds similar to those now raised on appeal. (See *People* v. *Green* (1980) 27 Cal.3d 1, 27-34 [164 Cal.Rptr. 1, 609 P.2d 468].)[30]

The claim also fails on the merits. Evidence that defendant suffered from a sexually transmittable disease over the eight-year period preceding his

---

[30]Evidence that defendant transmitted the disease to his three prior victims was elicited from several witnesses in the following order: (1) Sheba, (2) Sheba's father, Herbert, (3) Lakecia, (4) Sheba's doctor, (5) Rosa, (6) Rosa's doctor, and (7) Rosa's mother, Carol. Defendant only objected during testimony by the second (Herbert) and fifth (Rosa) witnesses. Defendant's sole complaint at trial was that they were discussing the hearsay results of laboratory tests or irrelevant details of medical treatment.

Similarly, defendant initially raised a relevance objection to evidence of Carol's gonorrhea only insofar as it was not temporally linked to her daughter Rosa's infection. The objection was effectively cured when the prosecutor elicited from Carol that she had contracted the disease from defendant within "a few days" of Rosa's diagnosis. Finally, defendant did not object when Officer Reese testified that Ruthie said she had contracted the disease from defendant around the time the capital crimes occurred.

attack on Lashan suggests that he knew or should have known he posed a special danger when he committed the lewd act against her. Moreover, on each of two prior occasions (1975 and 1979), at least two females who claimed contemporaneous sexual contact with defendant contracted gonorrhea within days of the claimed encounters. As noted by the prosecutor in closing argument, such evidence corroborated each victim's identification of defendant as the perpetrator of the prior sexual assault.

Defendant also argues the court erred in allowing Lakecia to testify that she became pregnant when defendant raped her in 1979. The point is waived for failure to object at trial. In any event, no error occurred. Because Lakecia testified that she gave birth to a child that defendant acknowledged as his own, evidence of the pregnancy tended to identify him as the perpetrator of the prior unadjudicated forcible rape.

Defendant next challenges questions posed to all three prior victims about how the sexual assaults had "affected" their lives and whether they had been able to "forget" them. Rosa, Sheba, and Lakecia each replied that they continued to experience pain, depression, and fear.

Defendant claims this "victim impact" evidence is irrelevant because it does not bear directly on the "violent" nature of his past criminal activity. This objection is waived for failure to timely assert it at trial.[31] We also reject it on the merits. Forcible sexual conduct with children is unlawful precisely because of the physical and emotional trauma it inevitably produces. The foreseeable effects of defendant's prior violent sexual assaults upon the victims—ongoing pain, depression, and fear—were thus admissible as circumstances of the prior crimes bearing on defendant's culpability. (Compare *People* v. *Boyde* (1988) 46 Cal.3d 212, 249 [250 Cal.Rptr. 83, 758 P.2d 25].)

For similar reasons, we reject defendant's related claim that the testimony violated *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529]. *Booth* held that the Eighth Amendment prohibits consideration of some "victim impact" evidence by a capital sentencing jury. Even assuming *Booth* applies to defendant in the wake of *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], *Booth* is not

---

[31]The prosecution asked Sheba and Lakecia about the effect of the prior rapes on the same day of trial. Defendant did not object. Rosa was called to the stand the next day. Before direct examination began, defendant asked the court to prevent her from being asked the same questions on relevance grounds. The court summarily declined the request. In our view, defendant should have objected when this line of questioning first began the previous day. Having failed to do so, he should have at least moved to strike the testimony of the first two witnesses when seeking to bar similar testimony by the third one.

implicated by argument or evidence mentioning the obvious emotional effect of defendant's prior sexual molestations on the victims. (*People* v. *Benson* (1990) 52 Cal.3d 754, 795-797 [276 Cal.Rptr. 827, 802 P.2d 330].) In any event, this portion of Rosa's, Sheba's, and Lakecia's testimony was insignificant in light of extensive properly admitted evidence concerning the despicable nature of both the prior and current crimes. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].)

 Defendant also claims the court erred in admitting evidence that Vesta had "mental or emotional problems" at the time he was sexually involved with her and was molesting her daughters, Sheba and Lakecia. Defendant argues that the circumstances surrounding his consensual adult relationship with Vesta are unrelated to the molestations.

As before, defendant has waived these points by failing to object on similar grounds at trial.[32] We also reject them on the merits. This evidence implied that defendant manipulated Vesta in order to gain access to Sheba and Lakecia. Contrary to what defendant argues here, the jury could reasonably view the vulnerability of Vesta and her daughters as an aggravating circumstance of the prior forcible rapes. (See, e.g., *People* v. *Melton, supra*, 44 Cal.3d 713, 757 [defendant financially manipulated elderly gay lover for several years before violently assaulting him].)

 Defendant finally observes that some of the foregoing witnesses mentioned that defendant was reasonably "intelligent" and did not act in a "crazy" or "bizarre" fashion around the time of the prior or current crimes. Defendant insists such general character evidence was not admissible in the prosecution's case-in-chief. (*People* v. *Boyd, supra*, 38 Cal.3d 762, 775-776.)

Defendant has waived this claim by failing to object on similar grounds below.[33] We also find that defendant was not prejudiced by any impropriety. The testimony was brief and mild, and it clearly would have been relevant and admissible to rebut defendant's evidence of mental disturbance and

---

[32]Evidence concerning Vesta's emotional condition was provided by Sheba and Herbert, respectively. Defendant made an unintelligible "foundation" objection during Sheba's testimony, but did not complain that either witness was giving an irrelevant or inflammatory opinion.

[33]The challenged testimony was elicited from five witnesses in the following order: (1) Officer Reese, based on defendant's conduct during the prearrest interrogation in this case, (2) Parole Officer Bandettini, based on his contact with defendant during a three-month period preceding the instant crimes, (3) Ruthie, based on her nine-month intimate relationship with defendant preceding the instant crimes, (4) Rosa, based on her observations of defendant shortly before and during the sexual assault in 1975, and (5) Carol, based on social contact with defendant during the same period. Defendant did not object until the last two witnesses testified. He raised an unclear "foundation" objection during both examinations and a relevance objection to an unimportant detail mentioned in one of them.

retardation. The prosecution also never argued that the mere absence of evidence of mental disturbance could be considered aggravating.

## B. *Psychotherapist-patient Privilege*

Defendant was called to the stand immediately after the first two defense witnesses, a detective and a forensic expert, testified about the capital crimes. At the end of defendant's direct examination, the prosecution sought immediate access to defendant's hospital records (i.e., St. Mary's, Napa, Atascadero, and Chope). The prosecutor argued that defendant had waived any applicable privilege by revealing his psychiatric history. Defendant renewed a prior claim that the psychotherapist-patient privilege applied, and that he had not tendered his mental condition within the meaning of the "patient-litigant" exception. (Evid. Code, §§ 1014, 1016.)[34] The court summarily granted the prosecutor's request on grounds the exception applied. The prosecutor obtained a continuance to review the records, which apparently totalled 2,000 pages.

▇▇▇ Defendant broadly argues that the court erred in "fail[ing] to place any limitation" on prosecutorial access to the records. The documents are not included in the appellate record, and defendant does not describe their content. His sole factual complaint concerns disclosure of entries in the Napa records which apparently describe sexual misconduct and assaultive behavior by defendant towards patients and staff. The prosecutor apparently relied on these entries during cross-examination. (See discussion, *post.*)

▇▇▇ It is settled that the patient-litigant exception authorizes disclosure of otherwise privileged matters bearing directly upon an emotional or mental condition voluntarily disclosed by the patient. (*In re Lifschutz* (1970) 2 Cal.3d 415, 431 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]; see also *People* v. *Wharton* (1991) 53 Cal.3d 522, 552 [280 Cal.Rptr. 631, 809 P.2d 290].) The exception recognizes that it would be unfair to allow the patient

---

[34]Evidence Code section 1014 grants the patient "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between patient and psychotherapist."

Evidence Code section 1016 exempts from the privilege any "communication relevant to an issue concerning the mental or emotional condition of the patient if such issue has been tendered by . . . [t]he patient."

These sections were first mentioned when defendant moved to quash the prosecutor's subpoena for production of the Napa and Atascadero records at the competence phase. Defendant disputed the prosecutor's claim that defendant had tendered the issue of his past psychiatric history by moving to establish his incompetence to stand trial. The trial court initially denied the motion to quash. It later vacated the order in response to an alternative writ of mandate obtained by defendant from the Court of Appeal.

to describe "at length to the jury in a crowded courtroom the details of his supposed ailment, and then neatly suppress the available proof of his falsities by wielding a weapon, nominally termed a privilege." (*Lifschutz, supra,* at p. 433, fn. 16, citations and internal quotation marks omitted.)

Assuming the pertinent records contained confidential communications, the trial court could reasonably conclude that defendant's "entire mental condition [had been] placed in issue [on direct examination] and that records of past psychotherapy [would] clearly be relevant" on cross-examination. (*In re Lifschutz, supra,* 2 Cal.3d 415, 435.) Defendant essentially claimed that mental problems had prompted his admission into St. Mary's as a teenager and had continued through his incarceration at Chope hospital as an arrestee in this case.[35] He also accused Napa and Atascadero of professional malpractice, but suggested he had nonetheless adjusted well in Napa.[36] The court did not err in concluding that defendant had waived the privilege insofar as it might otherwise apply to recorded information about his condition, treatment, and performance at these institutions.

## C. *Cross-examination of Defendant*

Defendant challenges two related topics of cross-examination. First, the prosecution asked defendant whether he had committed 11 acts of sexual misconduct at Napa between the ages of 16 and 18. They included four acts of consensual sexual intercourse with female patients (three which defendant admitted and one which he denied), and seven instances of sexually soliciting or "groping" female patients and staff (three which defendant denied and four which he did not recall).[37] These questions were apparently based on the Napa records, and no other evidence on the issue was presented.

Second, defendant was asked whether he had committed 17 unprovoked physical assaults and threatened 3 acts of violence against patients and staff

---

[35]Defendant testified on direct examination that he suffered from "hallucinations" as a child and as a patient at Chope hospital; that he had a sexual "problem" with his sister and uncontrollably choked a neighbor lady as a teenager; that he experienced disturbing sensations around young girls as an adult; and that he believed there was "something wrong with [his] mind" at the time of the capital trial.

[36]Defendant testified on direct examination that he was improperly placed in the adult unit and given excessive medication when first admitted to Napa; that Napa delayed in moving him to the adolescent unit even though the staff knew he had been raped by an adult patient; that Napa failed to help him benefit from therapy; and that Napa prematurely released him at age 16, leading to his suicide attempt and readmission. Defendant also indicated that despite these problems he felt "adjusted" and "relaxed" once he entered Napa's adolescent unit. Finally, defendant testified that Atascadero placed him in the wrong group therapy program, and that he essentially had no choice but to seek a transfer to state prison.

[37]Defendant volunteered that one of his sexual partners at Napa may have had a venereal disease, but he denied contracting it.

at Napa. A typical example involved defendant striking another patient for changing the television channel in the recreation room. Defendant testified that he did not recall any of these incidents. It appears the prosecution relied on hospital records. No other evidence of these acts was introduced.

 Defendant argues that the prosecutor asked the foregoing questions without a " 'good faith belief' " that they were true, and for the improper purpose of placing damaging insinuations before the jury. (*People* v. *Perez* (1962) 58 Cal.2d 229, 241 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], citation omitted; see also *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1098 [259 Cal.Rptr. 630, 774 P.2d 659].)

Defendant has waived the point by failing to object on similar grounds below.[38] In any event, the requisite "good faith" can be inferred from the record. The factual specificity of the challenged questions indicates that they stemmed from information gleaned during the prosecution's review of records obtained from the defense. Defendant admitted that some of the acts had occurred, denied others, and gave equivocal answers about the rest. Under the circumstances, the prosecutor could properly ask leading questions of defendant—a hostile witness—and leave the jury to deem his nonaffirmative responses incredible.

 Defendant's next claim begins with the observation that under *People* v. *Boyd, supra,* 38 Cal.3d 762, 775-776, the prosecution may not introduce evidence of defendant's "bad character" in its case-in-chief unless it bears on a specific aggravating factor listed in section 190.3. Defendant notes that while the prosecution may nonetheless rebut mitigating character evidence presented by defendant under "expanded factor (k)" (*Boyd*, at pp. 775-776),[39] such rebuttal evidence must relate "to a particular incident or character trait" raised by defendant. (*People* v. *Rodriguez, supra,* 42 Cal.3d 730, 792, fn. 24; see also Evid. Code, §§ 210, 761.) Defendant argues that

[38]The prosecutor asked most of the sexual misconduct questions without substantive objection from defense counsel. When the prosecutor returned to the topic several hours later, counsel argued that the questions were irrelevant and beyond the scope of direct examination. However, he did not move to strike defendant's earlier testimony, and never claimed the prosecutor was acting in bad faith.

Defense counsel also remained silent until the prosecutor had elicited answers about half of the assaultive acts. Counsel eventually claimed a mistrial was warranted because the questions were "irrelevant" and "unfounded," but did not accuse the prosecutor of misconduct.

[39]The jury was instructed that, under section 190.3, factor (k), it could consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any *sympathetic or* other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, *whether or not related to the offense for which he is on trial.*" The italicized language modifies and more than satisfies standard instructional language set forth in *People* v. *Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813].

cross-examination questions concerning his alleged sexual and assaultive misconduct at Napa do not meet this standard.

The point is waived for failure to timely object below. (See fn. 38, *ante.*) We also reject it on the merits. Evidence that defendant engaged in a pattern of violent and disruptive behavior at Napa tended to rebut several good character statements and inferences presented on direct examination: (1) that he "adjusted" well in Napa's structured environment except insofar as he passively withdrew in therapy, (2) that he did not participate in covert "sexual activities" among the patients at Napa, and (3) that he was not a "violent" person and had never been "in any trouble concerning violence." The prosecutor could properly ask defendant about specific incidents of misconduct directly contradicting these claims. (See, e.g., *People* v. *Rodriguez, supra,* 42 Cal.3d 730, 791-792 & fn. 24 [defendant's act of reaching for a shotgun when stopped by a police officer rebutted evidence of his gentle and loving nature].)

■■■ Defendant suggests the prosecutor also improperly asked whether he had invited a 5-year-old neighbor girl, Michelle S., into the house at age 14, removed her panties, and ejaculated on her. Defendant denied committing the molestation, which allegedly occurred a few months before he sexually molested his sister.

Defendant has waived any challenge to this evidence by failing to object to its admission below. We also see no impropriety under the principles discussed above. The Michelle S. incident was relevant because it rebutted defendant's earlier testimony that he had not thought about or been "exposed" to sex before the incident with his sister.

Reference to the molestation of Michelle also did not violate the "good faith" rule. The prosecutor informed the court before the penalty phase began that Michelle could not be located and would not be called in its case-in-chief. Nevertheless, the prosecution called Juvenile Probation Officer Ringer in rebuttal at the penalty phase. Ringer testified that during an official investigation of the incident 17 years before the instant trial, defendant admitted having "sexual contact" with Michelle.[40]

---

[40]We further note that the prosecutor requested and received a special instruction citing *People* v. *Boyd, supra,* 38 Cal.3d 762. It told the jury not to consider defendant's behavior at Napa as "evidence of any wrongdoing" or as "a factor in aggravation," and to consider it only for the "limited purpose of determining the nature of any mental disease or defect suffered by the defendant, and the appropriateness of the treatment provided." Another instruction told the jury that they could consider only four acts of violent criminal activity as aggravating under section 190.3, factor (b), namely, the sexual assaults upon Rosa, Sheba, and Lakecia, and the

D. *Exclusion of Defense Evidence*

Defendant claims the trial court erroneously prevented three defense witnesses from answering certain questions during direct examination. (*Skipper* v. *South Carolina* (1986) 476 U.S. 1, 4 [90 L.Ed.2d 1, 6-7, 106 S.Ct. 1669].) As we will explain, any error was harmless beyond a reasonable doubt. (*People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342]; see *Chapman* v. *California, supra,* 386 U.S. 18, 24 [17 L.Ed.2d 7055, 710-711].)

 Defendant first argues that the court erred in sustaining the prosecutor's relevance objections to the following questions asked of Dr. Walker about the psychological care defendant received before the instant crimes: (1) "what should have been done" for defendant during each hospital and prison stay, (2) how has the professional "perception" and "treatment" of pedophilia "change[d]" over the years, and (3) "what should have been done to safeguard the public" each time defendant was released from an institution. Defendant insists here, as in his offer of proof below, that evidence of the state's "improper" diagnosis and treatment should have been allowed in mitigation.

We agree. The proffered evidence was relevant and admissible insofar as it suggested that defendant had sought and/or been denied treatment which might have controlled the same dangerous personality disorder that purportedly contributed to the instant crimes. The jury could reasonably view such fact as bearing on defendant's moral culpability. (See *People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1173 [270 Cal.Rptr. 286, 791 P.2d 965].)

Nevertheless, the jury heard a detailed account of the "inappropriate" treatment received by defendant during each institutional confinement. Based upon commitment records and personal interviews, Dr. Walker and Dr. Haney testified that defendant: (1) should not have been placed in the adult unit when first admitted to Napa, (2) should have received individual therapy geared toward pedophilia at Napa and Atascadero, instead of the "unfocused" group therapy actually provided, (3) should have received individual therapy in prison, and (4) showed no improvement upon his release from each institution. Both psychologists blamed the various institutions for failing to properly diagnose defendant as a paranoid/pedophiliac. Moreover, Dr. Walker thoroughly described modern treatment techniques for such diagnosis, i.e., establishing a one-on-one therapeutic relationship which overcomes the patient's extreme mistrust and denial, but compels him to

---

battery upon Herbert (Sheba and Lakecia's father). This instruction also made clear that such acts must be proven beyond a reasonable doubt. Finally, the prosecutor embraced these principles in closing argument. She stated, among other things, that the jury was not to consider the molestations of Michelle S. and defendant's sister or the misconduct at Napa as aggravating under factor (b).

confront the harm he has caused. Defense counsel also emphasized "institutional failure" as a mitigating factor in closing argument. No prejudice occurred.

 Defendant next observes that Mrs. Bailey, a close family friend, was asked whether defendant deserved mercy. She said, "yes," and explained that imposition of the death penalty would devastate defendant's parents and the Baileys. Mrs. Bailey then began to plead for "mercy" from the witness stand, asking the court to "please" do "anything" in its power to prevent a death sentence. The court informed Mrs. Bailey that she had answered the question. She nonetheless continued her plea: *"Please. Please. Thank you. God Bless you. I thank you. But please—."* (Italics added.) The court intervened and instructed the jury to disregard the italicized portion of her testimony.

As noted by defendant, a capital defendant is entitled to introduce at the penalty phase the opinions of family and friends about the appropriateness of a death sentence in his particular case. Such evidence "exemplifie[s] the feelings held toward defendant by a person with whom he [has] had a significant relationship," and bears on his overall character and humanity. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 194 [246 Cal.Rptr. 673, 753 P.2d 629].)

The court did not violate this principle here. Mrs. Bailey was permitted to state that defendant should not be sentenced to death. She also described the emotional effect the sentence would have upon persons who had known him since birth. The court intervened only because Mrs. Bailey continued to beg for mercy after having been advised that she had answered the question. The court could properly strike the portion of her testimony amounting to a nonsubstantive emotional outburst.

 Defendant also claims the court erred in sustaining the prosecutor's objection when Mr. Bailey was asked whether defendant should be sentenced to death. Although such ruling was erroneous under *Heishman, supra,* 45 Cal.3d at page 194, no prejudice occurred. Mr. Bailey testified that he had fond memories of defendant and believed he deserved "help." Moreover, Mrs. Bailey indicated that she *and* her husband viewed defendant as a grandson, and would be devastated if he were sentenced to death. Thus, despite the court's ruling, the jury was fully informed that the Baileys believed defendant's life should be spared.

E. *Expert Opinion on the Death Penalty*

Dr. Haney gave extensive direct examination testimony about defendant's pedophilia, paranoid personality, borderline retardation, and past "inappro-

priate" care. On cross-examination, Dr. Haney revealed that he had testified many times in death penalty trials—always for the defense. Over defendant's relevance objection, the prosecutor asked Dr. Haney whether he was "opposed to the death penalty." He said he did not oppose it per se. When the witness was asked whether he opposed it "in this case," he said, "yes." On redirect examination, defendant asked Dr. Haney to explain the last answer. The court sustained the prosecutor's relevance objection before an explanation was given.

The prosecution eventually called Dr. Missett, a psychiatrist, in rebuttal. On direct examination, he testified that defendant was a "predatory" pedophile who suffered from no neurological disease or psychosis, showed signs of an antisocial personality disorder, and resisted legitimate treatment efforts. On cross-examination, defendant asked Dr. Missett whether he was in "favor of the death penalty in this case." The court commented that the witness could answer "yes" or "no" and could "explain his answer." Defendant objected, noting that Dr. Haney had not been allowed to give a similar explanation. The court overruled the objection. Dr. Missett testified that he did not oppose the death penalty here because defendant committed a vicious crime, had no mental disease, and rejected past treatment opportunities.

The jury was excused for the day. Defendant immediately moved for a mistrial on grounds Dr. Haney should have been allowed to explain his answer and rebut any inference of personal bias about the death penalty. The prosecutor offered to prepare a jury instruction limiting consideration of expert testimony about the death penalty to its potential bearing on bias.

Penalty phase instruction began the next morning. Before the jury entered the courtroom, defendant raised a minor objection to the prosecutor's proposed instruction concerning expert opinion on the death penalty. The court agreed to modify the instruction in the manner urged by defendant. It also offered either to strike Dr. Missett's explanation for favoring the death penalty, or to allow Dr. Haney to state the reasons underlying his contrary opinion. The prosecution said it had no objection in either case.

After a brief recess, defendant said Dr. Haney could not be reached by phone. The court denied defendant's mistrial motion, and called the jury into the courtroom. It then instructed the jury, as promised, to "completely disregard any of the reasons that Dr. Missett gave" for favoring the death penalty.[41]

---

[41]The court also suggested that another instruction would prevent the jury from relying on expert opinion about the death penalty in determining defendant's sentence: "I will instruct

The court also eventually read the instruction approved by both parties. It said that both experts had "testified regarding their respective views on the death penalty. This testimony was not offered for the purpose of determining whether or not the death penalty is appropriate in this case. Rather, [it] was offered and may be considered by you only for the limited purpose of determining what, if any, bias the witness has for or against the death penalty, and the extent to which such bias . . . bears on your evaluation of [the witness's] credibility. [¶] The question of which penalty to impose is a matter for your determination, and you may not take into account any opinion expressed by any expert witness as to which penalty should be imposed."

■■■ Defendant first argues that the court erred in allowing *any* questions about the death penalty. He views all such testimony as incompetent expert opinion on the "ultimate issue."

We disagree. Questions seeking to elicit a partisan expert's philosophical views on capital punishment might disclose some bias bearing on the expert's credibility as a witness at the penalty phase. (See Evid. Code, §§ 210, 780, subd. (f).) Here, the instruction approved by both parties allowed the jury to consider expert opinion on the death penalty only for this "limited purpose."

Nevertheless, we disapprove questions posed to each expert about whether and/or why they favored or opposed death *"in this case."* (Italics added.) Detailed testimony on this issue might lead the jury to confuse expert opinion on a pertinent mental condition with an opinion on the appropriate punishment. At a minimum, direct testimony on the latter issue would not "assist" the jury in making its normative, individualized penalty determination. (See Evid. Code, § 801, subd. (a).) In future cases, trial courts should preclude examination of an expert witness on the appropriateness of death in a particular case.

Nevertheless, any impropriety here was clearly harmless. Counterbalancing testimony was given by each expert—one favored death and the other opposed it "in this case." The jury was also told that such testimony could not be considered in determining the "appropriate" penalty for defendant's crimes, and that it was relevant only on the limited question of bias. Finally, the penalty jury heard overwhelming graphic evidence in aggravation and extensive conflicting evidence about defendant's psychological history and condition. There is no reasonable possibility that competing experts' predictable views on sentencing could have affected the jury's verdict.

you with reference to the opinions of both Dr. Haney and Dr. Missett [that] their position . . . on the death penalty should not play any [role in] what your verdict is in this case."

■ Defendant also contends the trial court erred in allowing only the prosecution's expert, Dr. Missett, to state the reasons underlying his opinion about the death penalty "in this case." However, no one-sided rehabilitation occurred. We can only assume the jury followed the court's first instruction and *"completely disregard*[ed]" this portion of Dr. Missett's testimony. (Italics added.)

## F. *Effect of Alleged Errors*

Defendant argues that the various asserted penalty phase errors, both singly and in combination, undermined the reliability of the death verdict. However, we have rejected most of these claims, and find the remainder to be inconsequential. No more need be said. (See *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1241 [255 Cal.Rptr. 569, 767 P.2d 1047].)

## VII. DISPOSITION

The judgment is affirmed in its entirety (S004708/Crim. 25377). The appeal consolidated therewith (Crim. 25540) is dismissed.

Lucas, C. J., Panelli, J., and Arabian, J., concurred.

**MOSK, J.**—I concur in the affirmance of the judgment of death and in the dismissal of the purported interlocutory appeal from the determination of mental competence. After review, I find no basis to do otherwise.

I write separately to express my views on the giving of certain instructions at the proceedings on mental competence and the introduction of so-called "victim impact" evidence at the penalty phase.

## I

Unlike the majority, I conclude that the trial court erred by instructing the jury at the proceedings on mental competence, in accordance with Penal Code section 1369, subdivision (f), that "The defendant is presumed to be mentally competent, and he has the burden of proving by a preponderance of the evidence that he is mentally incompetent . . . ." For the reasons stated in my dissenting opinion in *People* v. *Medina* (1990) 51 Cal.3d 870, 913-914 [274 Cal.Rptr. 849, 799 P.2d 1282], I believe that such an instruction is erroneous under the due process clause of the Fourteenth Amendment to the United States Constitution, and that the contrary view of the majority in that decision is simply wrong.

Reversal, however, is not required. Evidently, the error is not reversible per se, but rather is subject to harmless-error analysis under the "reasonable doubt" standard of *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. (*People* v. *Medina*, *supra*, 51 Cal.3d at p. 922 (dis. opn. of Broussard, J.).) Applying the *Chapman* test, I find no prejudice. Through his claim of the attorney-client privilege, which he asserted insistently, defendant must be deemed to have conceded the issue of mental competence. (Cf. *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1267-1269 [275 Cal.Rptr. 729, 800 P.2d 1159] (conc. & dis. opn. of Mosk, J.) [discussing harmless-error analysis under *Chapman* for instructional error involving mandatory conclusive presumptions, including the use of the "concession" rationale].)

## II

Like the majority, I conclude that the trial court did not err by admitting at the penalty phase the testimony of "other crimes" victims Rosa, Sheba, and Lakecia relating to the effect of those offenses on their lives.

There was no error under state law.

"Under the 1978 death penalty law (Pen. Code, § 190 et seq.), the determination of punishment turns on the personal moral culpability of the capital defendant. [Citations.] Culpability is assessed in accordance with specified factors of 'aggravation' and 'mitigation' (Pen. Code, § 190.3) as construed in the case law: (a) the circumstances of the crime; (b) prior violent criminal activity; (c) prior felony convictions; (d) extreme mental or emotional disturbance; (e) victim participation or consent; (f) reasonable belief in moral justification or extenuation; (g) extreme duress or substantial domination; (h) impairment through mental disease or defect or through intoxication; (i) age; (j) status as an accomplice and minor participant; and (k) any other extenuating fact." (*People* v. *Gallego* (1990) 52 Cal.3d 115, 207 [276 Cal.Rptr. 679, 802 P.2d 169] (conc. opn. of Mosk, J.); accord, *People* v. *Cox* (1991) 53 Cal.3d 618, 702 [280 Cal.Rptr. 692, 809 P.2d 351] (conc. & dis. opn. of Mosk, J.).)

Plainly, the defendant's personal moral culpability depends on *both* the subjective guilt he incurred by committing his crime *and* the objective harm he caused through its commission.

I turn to the case at bar. The testimony of Rosa, Sheba, and Lakecia was admissible under state law. Of course, "evidence . . . concerning the nature and circumstances of the capital offense [and] the effect of that offense on the victim" is relevant to the material issue of the circumstances of the

crime. (*People* v. *Benson* (1990) 52 Cal.3d 754, 797 [276 Cal.Rptr. 827, 802 P.2d 330].) So too, similar evidence relating to other violent offenses—like the testimony in question—is relevant to the material issue of prior violent criminal activity. (*Ibid.*)

Neither was there error under the United States Constitution.

Unlike the 1978 death penalty law, which requires the imposition of a penalty that is proportionate to the defendant's personal moral culpability, the cruel and unusual punishments clause of the Eighth Amendment merely prohibits the imposition of a penalty that is disproportionate thereto (*People* v. *Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676]).

In *Booth* v. *Maryland* (1987) 482 U.S. 496, 502-509 [96 L.Ed.2d 440, 448-452, 107 S.Ct. 2529], the United States Supreme Court concluded that the introduction of evidence concerning such matters as the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the opinions of family members about the crime and the criminal—except to the extent it related directly to the circumstances of the crime—was violative of a criminal defendant's rights under the cruel and unusual punishments clause, and that accordingly such evidence was inadmissible per se. In *South Carolina* v. *Gathers* (1989) 490 U.S. 805, 810-812 [104 L.Ed.2d 876, 882-883, 109 S.Ct. 2207], the court followed *Booth* and concluded that the presentation of argument relating to such matters was violative of those same rights and as such was improper per se.

I turn again to the present case. The testimony of Rosa, Sheba, and Lakecia was not inadmissible under the cruel and unusual punishments clause. *Booth* and *Gathers* "do not extend to evidence or argument concerning the nature and circumstances of the capital offense or the effect of that offense on the victim. . . . [Neither do they] extend to evidence or argument relating to the nature and circumstances of other criminal activity involving the use or threat of force or violence *or the effect of such criminal activity on the victims . . . .*" (*People* v. *Benson, supra,* 52 Cal.3d at p. 797, italics added.)

Recently, in *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], the court overruled *Booth* and *Gathers to the extent that they held that evidence or argument relating to the victim's personal characteristics or the emotional impact of the crime on the victim's family was inadmissible or improper per se. (Id.* at p. __ [115 L.Ed.2d at pp. 738-739, 111 S.Ct. at p. 2611].) It did not reach the holdings of those cases as to evidence or argument concerning the opinions of family members about the crime and the criminal. (*Id.* at p. __, fn. 2 [115 L.Ed.2d at p. 739, fn. 2, 111 S.Ct. at

p. 2611, fn. 2].) It *permitted* the states to allow the kind of evidence and argument at issue. (*Id.* at p. __ [115 L.Ed.2d at p. 736, 111 S.Ct. at p. 2609].) But it did not *require* them to do so. (See *id.* at p. __ [115 L.Ed.2d at pp. 736-737, 111 S.Ct. at p. 2609].)[1]

In this connection, the following observation should be made. Under the 1978 death penalty law, evidence and argument concerning the victim's personal characteristics, the emotional impact of the crime on the victim's family, and the opinions of family members about the crime and the criminal are generally inadmissible and improper. In the usual case at least, none of those three topics appears sufficiently relevant to any material issue. That conclusion follows from a review of the statutory aggravating and mitigating factors. It also follows from a consideration of the question that is crucial here, i.e., the defendant's personal moral culpability. As stated above, culpability depends on both subjective guilt and objective harm. Typically, none of the three topics identified above is probative of guilt. So much is clear. But neither is any of them probative of harm. The criminal law takes account of the general injury to society as a whole that arises from crime, not the peculiar hurt suffered by any of its particular members. True, the three topics may vividly depict the latter. But they do not appreciably reveal the former.

### III

For the reasons stated above, I concur in the affirmance of the judgment of death and in the dismissal of the purported interlocutory appeal from the determination of mental competence.

**KENNARD, J.**—I concur in the judgment. I agree with most of the majority's reasoning. I disagree, however, with certain aspects of the majority's treatment of defendant's contention that the trial court erred in allowing defendant himself to assert the attorney-client privilege at the competency hearing.

In support of his contention, defendant relied on *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485]. In *Samuel*, we stated that in representing a client "as to whose competence the judge has declared a doubt sufficient to require a [Penal Code] section 1368 hearing," an attorney "should not be compelled to entrust key decisions about fundamental matters

---

[1]Of course, "a new [federal constitutional] rule for the conduct of criminal prosecutions"— like that of *Payne*—"is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (*Griffith* v. *Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 661, 107 S.Ct. 708].)

to his client's apparently defective judgment." (*Id.* at p. 495.) In this case, the majority expresses some doubt about "the continuing validity of *Samuel*" in light of our recent opinion in *People* v. *Medina* (1990) 51 Cal.3d 870, 881-885 [274 Cal.Rptr. 849, 799 P.2d 1282], upholding the constitutionality of Penal Code section 1369, subdivision (f), which allocates the burden of proof at a competency hearing to the party seeking to establish the defendant's incompetence. (Maj. opn., *ante,* p. 183.) In my view, the allocation of the burden of proof at the hearing to determine whether a defendant is competent to stand trial does not alter the fundamental obligation for a criminal defense attorney to render effective representation to a client at such a hearing. Under the statutory scheme governing the procedures for determining competency, there is no hearing until either the court or trial counsel makes an initial determination that the defendant's mental competence is in doubt. (Pen. Code, § 1368.) Because that initial determination calls into question the judgment of a defendant who is subject to a section 1368 hearing, *Samuel*'s conclusion that defense counsel should not entrust key decisions to such a defendant was correct.

Also, it does not appear that the attorney-client privilege was even applicable to the specific question asked in this case. The attorney representing defendant at the competency hearing called defendant's trial counsel as a witness and asked his opinion of defendant's competence to stand trial. Because the question as posed would not require trial counsel to reveal the content of any confidential conversations he had with defendant, he could have answered it without violating the attorney-client privilege.

As the majority opinion correctly points out, however, we need not consider whether the trial court erred in permitting defendant to invoke the attorney-client privilege. Neither defendant's trial counsel nor the attorney appointed to represent him at the competency hearing objected to defendant's assertion of the privilege. Thus, the issue was not preserved for appeal.

Broussard, J., concurred.

Appellant's petition for a rehearing was denied October 30, 1991.