Filed 3/22/13  P. v. Aniceto CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

| | |
|---|---|
| THE PEOPLE, | C069293 |
| Plaintiff and Respondent, | (Super. Ct. No. SF115216A) |
| v. | |
| ISMAEL ROSALES ANICETO, | |
| Defendant and Appellant. | |

A jury found defendant Ismael Rosales Aniceto guilty of attempted premeditated murder (Pen. Code,[1] §§ 664, 187, subd. (a); count 1); permitting another to shoot from a vehicle (former § 12034, subd. (b); count 2); street terrorism (§ 186.22, subd. (a); count 3); and assault with a firearm (§ 245, subd. (a)(2); count 4).  The jury also found true allegations defendant committed counts 1, 2, and 4 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), a principal intentionally and personally discharged a firearm in the commission of count 1 (§ 12022.53, subds. (c) & (e)), and defendant personally used a firearm in the commission of count 4 (§ 12022.5, subd. (a)).

---

[1] Further undesignated statutory references are to the Penal Code.

1

The trial court sentenced defendant to an aggregate term of 44 years to life in state prison, consisting of: 7 years to life for the attempted murder (count 1), plus an additional 20 years under section 12022.53, subdivision (c); and a consecutive 3 years (the middle term) for the assault (count 4), plus an additional 4 years under section 12022.5, subdivision (a), and an additional 10 years under section 186.22, subdivision (b)(1)(C). The trial court stayed defendant's sentence on counts 2 and 3 pursuant to section 654. It also declined to impose the enhancement for participation in a criminal street gang appended to count 1 pursuant to section 12022.53, subdivision (e)(2).

Defendant appeals, contending the trial court erred when it: (1) failed to suppress statements he made during a booking interview because the correctional officer conducting the interview did not give him *Miranda*[2] warnings; (2) instructed the jury on the natural and probable consequences doctrine in connection with the attempted murder charge where there was no evidence to support it; and (3) imposed additional punishment for defendant's firearm use under both sections 12022.5, subdivision (a), and section 186.22, subdivision (b)(1)(C). Defendant also asserts there is insufficient evidence to support a finding that the attempted murder was a natural and probable consequence of the target offense (assault), and therefore, his conviction for attempted murder must be reversed on that basis as well.

We shall conclude that the trial court improperly imposed enhancements for both personal firearm use (§ 12022.5, subd. (a)) and committing a violent felony to benefit a criminal street gang (§ 186.22, subd. (b)(1)(C)) on count 4, reverse defendant's sentence on that count, and remand the matter for resentencing. We shall affirm the judgment in all other respects.

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

## FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of March 18, 2009, Angelo Villanueva and his brother, both members of the Norteño criminal street gang, visited Villanueva's girlfriend at the Farmington Apartments, known Sureño turf, in Stockton. While Villanueva and his girlfriend were standing outside her apartment, defendant and Samuel Paniagua, a member of the Sureño criminal street gang, approached them. Defendant pulled out a gun, pointed it at Villanueva's chest, and asked, "[W]hy are you so scared?" Paniagua stood behind defendant; he did not say anything. Villanueva had a run-in with Paniagua a few weeks earlier.

Villanueva's girlfriend told Villanueva and his brother to "get in" her apartment, but instead, they got on their bicycles and left. Defendant and Paniagua immediately got into a white van and followed them. Defendant drove the van, and Paniagua was his passenger. Paniagua fired four or five shots at Villanueva and his brother out of the passenger side window of the van. Villanueva and his brother fell to the ground, and defendant and Paniagua drove off. The van maintained its speed as the shots were being fired. Neither Villanueva nor his brother was shot.

A detective in the Stockton Police Department's Gang Suppression Unit and an expert in Hispanic criminal street gangs in Stockton described the "violent" rivalry between the Norteño and Sureño criminal street gangs and Hispanic gang culture. Gang members thrive off the respect of other gang members and must retaliate when "disrespected" by a member of a rival gang to maintain their status within the gang. It is disrespectful for a rival gang member to wear his gang's color into a neighborhood dominated by a rival gang.

Gang members display their gang affiliation through their clothing, tattoos, and verbiage. Sureños are associated with the color blue, while Norteños are associated with the color red. Sureños tend to dress conservatively in earth tones and have shaved heads or very short hair. Norteños typically dress more flamboyantly and have longer hair.

3

There are separate sub-sets within the Sureño criminal street gang, including the Vicky's Town (VST) and Playboy Sureños (PBS).

Villanueva often wore his red rosary necklace on the outside of his clothes when he visited his girlfriend even though he was aware that Sureños lived in her apartment complex, and he was wearing it on the day in question. The gang expert opined that Villanueva purposefully disrespected the Sureños living in the Farmington Apartments by wearing his red rosary, and that defendant and Paniagua were compelled to respond. The expert described the confrontation as a "hit up." According to the expert, a "hit up" occurs when a gang member confronts a rival gang member and typically involves brandishing a weapon and an exchange of words. Fellow gang members serve as witnesses and backup for one another. Villanueva's girlfriend also believed the confrontation was due to Villanueva's membership in the Norteño criminal street gang.

On June 29, 2010, defendant was interviewed at the San Joaquin County Jail by Stockton Police Officer Jeffrey Tacazon, with the aid of a Spanish-speaking interpreter. Prior to interviewing defendant about the crime, Tacazon read defendant his *Miranda* rights, and defendant indicated that he understood each of the rights and stated he was willing to speak to Tacazon.

On June 30, 2010, Deputy Kristy Mays, a correctional officer at the San Joaquin County Jail, conducted a booking interview of defendant during which defendant stated that he was a Sureño, and that he had enemies who were Norteños.

On February 10, 2011, a correctional officer at the San Joaquin County Jail found a roster inside an inmate's cell that listed Sureño gang members who were housed in a certain section of the jail. The roster contained the names of gang members along with their cell numbers, booking numbers, nicknames, "hood" or gang sub-sets, and the charges pending against them. Defendant was listed on the roster as having the moniker "Griyo" and belonging to "LVT." The gang expert was not familiar with "LVT" but acknowledged there could be active sub-sets of which he was not presently aware.

4

The gang expert opined that defendant was an active member of the Sureño criminal street gang based on the following: he associated with Paniagua, a documented Sureño gang member; he was involved in a gang-related incident; and he admitted being an active member of the Sureño criminal street gang during his booking interview. The expert stated that defendant's inclusion in the roster confirmed his opinion that defendant was a Sureño gang member.

## DISCUSSION

### I
### The Trial Court Did Not Err in Admitting Evidence Defendant Claimed a Gang During His Booking Interview

Defendant first contends that the "[i]ntroduction of evidence that [he] claimed a gang during the booking interview violated [his] constitutional rights against self-incrimination and to due process of law."

Prior to trial, defendant moved to exclude statements he made during a booking (or jail classification) interview, arguing his statements were taken in violation of *Miranda*. The trial court held an evidentiary hearing (Evid. Code, § 402) at which Deputy Mays, the correctional officer who conducted the interview, testified. Mays interviewed defendant on June 30, 2010. At the time, she was working "classification" at the jail. Each inmate who is going to remain in custody at the jail goes through the same booking interview process, during which the inmate is asked, among other things, "if they have any affiliation with gangs in order to determine if they have enemies in jail . . . ." The sole purpose of the gang-related questions is to determine appropriate housing for each inmate. During the booking interview at issue here, Mays asked defendant if he claimed any gang affiliation, and he responded, "yes." She then asked him if he claimed Sureño, and he said, "yes." To be sure, she asked him if he had enemies that were Norteño gang members, and he said, "yes." The interview was conducted in a holding cell in the San Joaquin County Jail's main lobby. Mays explained that there is a "general

5

lobby where the masses sit and then special holding cells for others that need protection." Knowing an inmate's gang affiliation is especially important in the case of Sureño gang members because the San Joaquin County Jail is a "highly populated Norteño jail and it would not be in a Sureño's best interest to put him in a lobby filled with a lot of Norteños that may be in [the jail's] custody off the street."

The trial court ruled the evidence was admissible, finding that the gang-related questions were not designed to elicit an incriminating response but were asked for the purpose of ensuring the safety of defendant and others in the jail.

*Miranda* admonitions must be given and an individual in custody must knowingly and intelligently waive those rights before being subjected to either express questioning or its "functional equivalent." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300-301 [64 L.Ed.2d 297, 307-308]; *People v. Ray* (1996) 13 Cal.4th 313, 336.) Unwarned statements made during a custodial interrogation, even if otherwise voluntary within the meaning of the federal Fifth Amendment, generally must be excluded from evidence at trial. (*Oregon v. Elstad* (1985) 470 U.S. 298, 307 [84 L.Ed.2d 222, 231]; *People v. Bradford* (1997) 14 Cal.4th 1005, 1033.)

Not all conversation between a police officer and a suspect constitutes interrogation under *Miranda*. (*People v. Ray*, *supra*, 13 Cal.4th at p. 338.) Ordinarily, the routine gathering of background information on a suspect such as in a booking process will not constitute an interrogation. (See *People v. Gomez* (2011) 192 Cal.App.4th 609, 630.) On the other hand, comments that go beyond preliminary identification inquiries and are designed to elicit an incriminating response are within the scope of *Miranda*. (See *People v. Gomez, supra,* at pp. 629-630.)

Whether the questions concerning defendant's gang affiliation were designed to elicit an incriminating response presents an interesting issue where, as here, Deputy Mays was aware of the charges pending against defendant, gang detectives have access to gang classification information, and such information is routinely included in reports prepared

6

by gang detectives; however, we need not consider that issue here because even assuming the booking interview constituted an interrogation, defendant was advised of and knowingly waived his *Miranda* rights prior thereto.

As previously mentioned, on June 29, 2010, defendant was interviewed at the San Joaquin County Jail by Officer Tacazon. Prior to interviewing defendant about the crime, Tacazon read defendant his *Miranda* rights, and defendant indicated that he understood each of the rights, and that he was willing to speak to Tacazon. While there is no indication in the record that defendant was readvised of his *Miranda* rights prior to the booking interview, " 'readvisement is unnecessary where the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights. [Citations.]' " (*People v. Lewis* (2001) 26 Cal.4th 334, 386, quoting *People v. Mickle* (1991) 54 Cal.3d 140, 170.) In *People v. Mickle*, *supra*, 54 Cal.3d at page 171, our Supreme Court held that readvisement was not required after a lapse of 36 hours between interrogations. The court considered the totality of the circumstances, including the fact that the defendant was still in custody, was interviewed by the same interrogators, was reminded of his prior waiver, and was familiar with the justice system. (*Ibid.*)

In this case, the booking interview occurred the day after defendant was interviewed by Officer Tacazon. Thus, the *Miranda* warnings would have been fresh in defendant's mind. Defendant remained in custody at the San Joaquin County Jail during the interim. While the identity of the interviewer changed, both interviews were conducted at the same location -- the San Joaquin County Jail. Moreover, the record indicates defendant subjectively understood his right to remain silent. He was fully

7

admonished of his rights the previous day and had voluntarily waived them, and there is no indication in the record suggesting that defendant was mentally impaired or otherwise incapable of remembering the prior advisement.

Defendant correctly observes that in *People v. Mickle*, *supra*, 54 Cal.3d at page 171, the court noted, as factors in the analysis, the defendant was interviewed by the same investigators and was readvised of his *Miranda* rights, factors not shown to exist here. Considering "the totality of the circumstances" (*People v. Mickle, supra,* at p. 170), however, we do not agree the absence of these factors alone undermine our finding that defendant participated in the booking interview voluntarily and with knowledge of his rights. That not all of the factors listed in *Mickle* were satisfied does not show that a second advisement was necessary. The factors are not a list of requirements that must all be satisfied. (See *People v. Williams* (1997) 16 Cal.4th 635, 661 ["no single factor is dispositive in determining voluntariness, but rather courts consider the totality of circumstances"].) Rather, the point of the factors is to assist in the determination of whether the advisement is " 'reasonably contemporaneous' " with the second interrogation and whether, at the time of the second interrogation, the defendant is still in the condition of having subjectively understood and waived his rights in light of the totality of the circumstances. (*People v. Mickle*, *supra*, 54 Cal.3d at pp. 170-171.)

To the extent defendant argues that his statement was involuntary because if he had chosen to remain silent he would have been housed with rival gang members who could harm him, this argument also lacks merit.

" ' "Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. . . . [I]n carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . ." [Citation.]' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 170.)

8

Here, there is no indication in the record that Deputy Mays threatened defendant or made any false promises of leniency. That exercising one's right to remain silent will have adverse consequences for the defendant does not make the defendant's statements involuntary. "The compulsion [to speak] must be attributable to the state." (*People v. Mickey* (1991) 54 Cal.3d 612, 650.) Here, any compulsion was attributable to defendant and not the state. In any event, defendant was not compelled to admit he was in a gang. He could have responded, as he does in his reply brief, that he "wanted to be housed with Sureños, because he hung out with Sureños at his apartment complex, and if Norteños learned of his friendship with Sureños he would be in danger."

The trial court properly admitted defendant's statements that he was a Sureño with Norteño enemies.

II

Defendant's Conviction for Attempted Murder Is Properly Sustained Under a Simple Aiding and Abetting Theory

At trial, the prosecutor argued defendant was guilty of attempted murder based on two theories: (1) defendant aided and abetted Paniagua in the attempted murder; and (2) defendant aided and abetted the earlier assault and a natural and probable consequence of that offense was the attempted murder. Defendant contends his conviction for attempted murder must be reversed because "the natural and probable consequence theory . . . is inapplicable because there is no evidence showing that Paniagua participated in the target offense of assault," and there is insufficient evidence to support a finding that the attempted murder was the natural and probable consequence of the earlier assault. As we shall explain, we need not address defendant's contentions related to the natural and probable consequences doctrine because the alternative theory advanced by the prosecution -- that defendant aided and abetted in the attempted murder itself -- is supported by substantial evidence, and there is no indication in the record that the jury

9

based its verdict on the natural and probable consequences doctrine. (See *People v. Guiton* (1992) 4 Cal.4th 1116, 1129 (*Guiton*).)

In *Guiton*, our Supreme Court explained that where, as here, "the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground." (*Guiton*, *supra*, 4 Cal.4th at p. 1129.)

The evidence is overwhelming that defendant aided and abetted in the attempted murder. To be liable as an aider and abettor, a defendant "must act 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1224, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 560.) Here, defendant and Paniagua followed defendant and his brother in a van. Defendant, who was driving, pulled alongside Villanueva and his brother, and Paniagua fired at them. The van maintained its speed as the shots were being fired. On this record, we have no trouble concluding that a jury reasonably could conclude that defendant knew that Paniagua intended to shoot at Villanueva and his brother, and that defendant facilitated the commission of the attempted murder by driving the van and positioning it so that Paniagua could shoot at the two men.

Moreover, having reviewed the record, we find no basis to conclude that the jury based its verdict on the natural and probable consequences doctrine. Although the prosecutor argued to the jury that the attempted murder was a natural and probable consequence of the earlier assault, he also argued defendant aided and abetted in the attempted murder itself. "[H]ow do you aid and abet? You make it possible. Could Samuel Paniagua have shot from a moving vehicle without a driver holding this particular car steady? No. . . . That's why, in drive-by shootings, the drivers and the shooters are equally responsible; you cannot have one without the other." Contrary to

10

defendant's suggestion, the prosecutor distinguished between the two alternative theories and did not spend significantly more time on the natural and probable consequences doctrine.

Accordingly, defendant's conviction for attempted murder is properly affirmed under a simple aiding and abetting theory of liability.

III

The Trial Court Erred in Imposing Additional Punishment for Defendant's Firearm Use Under Both Section 12022.5, Subdivision (a) and Section 186.22, Subdivision (b)(1)(C).

Defendant contends, and the People agree, that the trial court's imposition of both the 4-year term for the firearm use enhancement (§ 12022.5, subd. (a)), and the 10-year term for the gang enhancement (§ 186.22, subd. (b)(1)(C)) on count 4 violated section 1170.1, subdivision (f). They are correct.

Pursuant to section 1170.1, subdivision (f), "[w]hen two or more enhancements may be imposed for being armed with or using a dangerous or deadly weapon or a firearm in the commission of a single offense, only the greatest of those enhancements shall be imposed . . . ." Section 12022.5, subdivision (a), states in pertinent part: ". . . any person who personally uses a firearm in the commission of a felony . . . shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years . . . ."[3] Section 186.22, subdivision (b)(1) "calls for additional punishment when a crime is committed to benefit a criminal street gang, with increasingly harsh levels of

---

[3] The exemption for felonies where "use of a firearm is an element of th[e] offense" (§ 12022.5, subd. (a)), does not apply to 'any violation of Section 245 if a firearm is used . . . ." (§ 12022.5, subd. (d).) "[B]ecause defendant's [crime] of assault with a firearm (§ 245, subd. (a)(2)) necessarily involved firearm use, at first glance, that would exempt him from the additional punishment. But because his firearm use pertained to 'violation[s] of Section 245,' defendant falls within the exception to the exemption and thus is subject to additional punishment under section 12022.5, subdivision (a), for personally using a firearm . . . ." (*People v. Rodriguez* (2009) 47 Cal.4th 501, 505 (*Rodriguez*).)

11

punishment: Subdivision (b)(1)(A) of section 186.22 provides for additional punishment of two, three, or four years' imprisonment for most felonies. Under subdivision (b)(1)(B), the additional punishment is increased to five years for 'serious' felonies, which are defined in section 1192.7's subdivision (c). And under section 186.22, subdivision (b)(1)(C) (the provision at issue here), the additional punishment is increased to 10 years for 'violent' felonies 'as defined in subdivision (c) of Section 667.5.' Here, [the count] of assault with a firearm (§ 245, subd. (a)(2)) qualified as a 'violent' felony under section 667.5, subdivision (c), because in committing [that offense] defendant "use[d] a firearm which use has been charged and proved" under section 12022.5. (§ 667.5, subd. (c)(8).)" (*Rodriguez, supra,* 47 Cal.4th at p. 505.)

In *Rodriguez, supra,* 47 Cal.4th 501, our Supreme Court held that when a defendant is convicted of a violent felony within the meaning of section 667.5, subdivision (c)(8), based on the defendant's use of a firearm under section 12022.5, a sentencing court's imposition of both the section 12022.5 enhancement and the section 186.22, subdivision (b)(1)(C) enhancement violates section 1170.1, subdivision (f). (*Rodriguez*, *supra*, at pp. 508-509.) *Rodriguez* concluded that the proper remedy was not to strike the 10-year gun use enhancement, but to reverse the judgment and remand the matter for resentencing. (*Id.* at p. 509.) The court stated, "Remand will give the trial court an opportunity to restructure its sentencing choices in light of our conclusion that the sentence imposed here violated section 1170.1's subdivision (f)." (*Ibid.*)

This case is on all fours with *Rodriguez*. Accordingly, here, as in *Rodriguez*, the court's imposition of both the 4-year firearm enhancement (§ 12022.5, subd. (a)), and the 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)) violated section 1170.1, subdivision (f), and only the greatest of those enhancements may stand. The proper remedy is to reverse the trial court's sentence and remand the matter to allow the court to

restructure the sentence so as to not violate section 1170.1, subdivision (f).  (*Rodriguez*, *supra*, 47 Cal.4th at p. 509.)

## DISPOSITION

Defendant's sentence on count 4 (assault with a firearm) is reversed, and the matter is remanded for resentencing consistent with section 1170.1, subdivision (f).  The judgment is affirmed in all other respects.

      BLEASE      , J.

We concur:

      RAYE      , P. J.

      MAURO      , J.